WESTINGHOUSE ELECTRIC CORPORATION, APPELLANT, v. BOARD OF REVIEW, DIVISION OF EMPLOYMENT SECURITY, DEPARTMENT OF LABOR AND INDUSTRY OF THE STATE OF NEW JERSEY, GENERAL CERAMICS & STEATITE CORPORATION, VIOLET H. ELKO, AND OTHER EMPLOYEES OF WESTINGHOUSE CLAIMING BENEFITS DURING THE PERIOD OF THE STRIKE, RESPONDENTS.

WESTINGHOUSE ELECTRIC CORPORATION, APPELLANT, v. BOARD OF REVIEW, *ETC.*, ANTHONY AMICO, *ET AL.*, RESPONDENTS.

WESTINGHOUSE ELECTRIC CORPORATION, APPELLANT, v. BOARD OF REVIEW, *ETC.*, FRANK KLAUS, *ET AL.*, RESPONDENTS.

WESTINGHOUSE ELECTRIC CORPORATION, APPELLANT, v. BOARD OF REVIEW, *ETC.*, THOMAS P. REDMOND, *ET AL.*, RESPONDENTS.

WESTINGHOUSE ELECTRIC CORPORATION, APPELLANT, v. BOARD OF REVIEW, *ETC.*, CORNELIA E. NAGY, *ET AL.*, RESPONDENTS.

Argued September 16 and September 23, 1957— Decided October 24, 1957.

Mr. *Walter F. Waldau* argued the cause for the appellant (*Messrs. Stryker, Tams & Horner,* attorneys).

Mr. *Sidney Reitman* argued the cause for the claimants-respondents (*Messrs. Kapelsohn, Lerner, Leuchter & Reitman,* attorneys).

Mr. *Clarence F. McGovern* argued the cause for the respondent Board of Review, Division of Employment Security, Department of Labor and Industry of the State of New Jersey.

The opinion of the court was delivered by

JACOBS, J. These are consolidated appeals from decisions of the Board of Review which determined that the claimants were not disqualified under *N. J. S. A.* 43:21–5(*d*) from receiving unemployment compensation benefits. The appellant Westinghouse Electric Corporation and the individual claimants-respondents have entered into a stipulation which portrays the following circumstances.

In the course of a labor dispute, employees at certain Westinghouse plants struck in October 1955 and caused stoppages of work. The striking employees were members of unions which had collective bargaining agreements with Westinghouse. In March and April 1956 the labor dispute and the work stoppages were terminated. The striking employees with whom we are concerned on this appeal (including claimants standing in the same position under

*N. J. S. A.* 43:21–5(*d*)) took temporary employment elsewhere during the strike. Some of them had substantial periods of work with other employers, others had very short periods of work during the Christmas season in 1955 with department stores and express companies, and still others "shaped up" daily at breweries and other places of employment. None of the claimants resigned from Westinghouse or surrendered the right to return to work for Westinghouse upon termination of the strike. They all intended to return to Westinghouse as soon as the strike ended and in fact they did so. During the strike Westinghouse advanced contributions under its Social Insurance Plan for its striking employees in order to avoid cancellation or lapse of the insurance, and tendered loans which were accepted by some of the claimants. Westinghouse also offered work to the striking employees but they rejected it because of the continuance of the strike. Neither Westinghouse nor the striking employees did anything which was designed to effect a severance of their employment relationship; and all the parties concede that there was no such severance. See *Browning King Co. of N. Y. v. Local 195,* 34 *N. J. Super.* 13, 26 (*App. Div.* 1955); *Textile Workers Union of America v. Paris Fabric Mills, Inc.,* 22 *N. J. Super.* 381, 383 (*App. Div.* 1952); *Jeffery-De Witt Insulator Co. v. N. L. R. B.,* 91 *F. 2d* 134, 112 *A. L. R.* 948 (4 *Cir.* 1937), *certiorari* denied 302 *U. S.* 731, 58 *S. Ct.* 55, 82 *L. Ed.* 565 (1937).

The claimants did not seek unemployment compensation benefits from the commencement of the strike in October 1955 and acknowledged that the labor-dispute disqualification (*N. J. S. A.* 43:21–5(*d*)) precluded such benefits. ·But they did seek benefits for subsequent periods during which they did not work after their interim or temporary work with other employers had terminated. They contended that the disqualification was inapplicable to these subsequent periods. The Board of Review held that the disqualification did not bar benefits to claimants who had in good faith obtained work elsewhere, even though their work was only "stop-gap" in nature and was not intended to interfere with

their eventual return to Westinghouse at the end of the strike. Westinghouse appealed and advances the contention that under a proper interpretation of *N. J. S. A.* 43:21–5(*d*) disqualification of a striking employee continues during the strike notwithstanding *bona fide* interim or temporary employment which is not intended to sever the employment relationship at the strike-bound plant. On the other hand the claimants advance the opposing contention that under a literal interpretation of *N. J. S. A.* 43:21–5(*d*) the disqualification is inapplicable to periods of unemployment after *bona fide* interim or temporary employment, notwithstanding the continuance of the employment relationship at the strike-bound plant.

New Jersey's Unemployment Compensation Law was adopted in 1936. *L.* 1936, *c.* 270; *R. S.* 43:21–1. It designated, in section 4, those who would be eligible for benefits and, in section 5, those who would be disqualified. Paragraph (d) of section 5 contained the labor disqualification clause which now provides that an individual shall be disqualified for benefits:

"(d) For any week with respect to which it is found that his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed; *provided*, that this subsection shall not apply if it is shown that:

(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

(2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; *provided*, that if in any case in which (1) or (2) above applies separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purposes of this subsection, be deemed to be a separate factory, establishment, or other premises."

Through the years many unsuccessful attempts have been made to amend paragraph (d). See *Ablondi v. Board of Review,* 8 *N. J. Super.* 71, 77 (*App. Div.* 1950); *Gerber*

*v. Board of Review, etc.,* 36 *N. J. Super.* 322, 331 (*App. Div.* 1955), affirmed 20 *N. J.* 561 (1956); *Mortensen v. Board of Review, etc.,* 21 *N. J.* 242, 248 (1956). Indeed the only successful attempt was *L.* 1945, *c.* 308 involving minor changes which have no bearing here. Similarly the exceptions set forth in the proviso to paragraph (d) have no bearing here, for the parties have expressly agreed that "the claimants on this appeal belong to different grades or classes of workers of which, immediately before the commencement of the stoppage at Westinghouse, there were members employed at the plants and premises where the work stoppages occurred, and that some of said members were participating in, financing or directly interested in said labor dispute."

█ The labor disqualification clause has been the subject of many law review articles which have advanced arguments in favor of its restriction or abolition. See *Fierst & Spector, "Unemployment Compensation in Labor Disputes,"* 49 *Yale L. J.* 461, 489 (1940); *Lesser, "Labor Disputes and Unemployment Compensation,"* 55 *Yale L. J.* 167, 177 (1945). *Cf. Williams, "The Labor Dispute Disqualification—A Primer and Some Problems,"* 8 *Vand. L. Rev.* 338, 353 (1955). Admittedly those arguments must be addressed to the Legislature rather than the courts. We are here concerned not with the wisdom of the disqualification clause but only with its meaning. *Ablondi v. Board of Review, supra.* Our judicial function is simply to carry out the legislative plan. *Watson v. United States Rubber Co.,* 24 *N. J.* 598, 603 (1957). In performing our judicial function we may resort freely to the pertinent statutory history for such aid as it may furnish in ascertaining the true sense and meaning of the language used. *Deaney v. Linen Thread Co.,* 19 *N. J.* 578, 584 (1955). And we are by no means confined to a literal interpretation of the statutory language. *Lloyd v. Vermeulen,* 22 *N. J.* 200, 205 (1956); *Lane v. Holderman,* 23 *N. J.* 304, 323 (1957). See *Guiseppi v. Walling,* 144 *F. 2d* 608, 624, 155 *A. L. R.* 761 (2 *Cir.* 1944), affirmed *sub nom. Gemsco v. Walling,* 324 *U. S.* 244, 65 *S. Ct.* 605,

89 *L. Ed.* 921 (1945) (concurring opinion). In the *Walling* case Judge Learned Hand made his well-known remark that "there is no surer way to misread any document than to read it literally." In the *Lane* case Justice Wachenfeld aptly noted that a statutory provision should be interpreted by a mind which is sympathetic to its aims and which recognizes the difficulties inherent in formulating a precise expression of legislative intent. In the course of his opinion he quoted approvingly from *Waters v. Quimby,* 27 *N. J. L.* 296, 311 (*Sup. Ct.* 1859), affirmed 28 *N. J. L.* 533 (*E. & A.* 1859), where the court said:

"When the words of a statute are susceptible of two meanings, the one favorable, and the other hostile to its principal design, the former should prevail and control the construction. Where the words are clear, and the difficulty is made by critical exposition, that exposition should not be adopted in clear contravention of the scope and policy of the act. Few statutes would stand if tried by the strictest standards of logic, grammar, or rhetoric."

Various grounds have been advanced in support of the disqualification clause. In *Tube Reducing Corporation v. Unemployment Compensation Commission,* 1 *N. J.* 177, 182 (1948), the court stressed that unemployment compensation funds are designed to afford protection to those who are involuntarily unemployed rather than those who voluntarily participate in labor disputes. In *Ablondi v. Board of Review, supra,* and *Mortensen v. Board of Review, etc., supra,* stress was laid upon the design of the disqualification to place the State in a wholly neutral position with respect to labor disputes. Fierst and Spector, in their early article on *"Unemployment Compensation and Labor Disputes," supra,* fairly summarized the matter as follows:

"Several reasons have recurrently been offered to justify disqualification for loss of employment due to a labor dispute. Most popular traditionally has been the argument that unemployment insurance schemes are intended to insure only against involuntary unemployment. Loss of employment due to a labor dispute is 'voluntary' and therefore beyond the pale. A second argument balks at the thought of permitting the state to take an 'unneutral' position in industrial

relations by 'financing' a labor dispute through unemployment insurance benefits. Coupled with this idea is a reluctance to lend any encouragement to strikes. And finally, some feel that it would be an ethical impropriety to subsidize strikers with funds derived from contributions made by employers."

*Cf. Williams, supra,* at 354, where reference is made to the additional argument that serious financial dangers would be involved "in undertaking to compensate large masses of workers who go out on strike," and that there is "no actuarial means to face up to such an unpredictable drain upon the compensation funds."

The labor disqualification clause was embraced in early British legislation and was carried over into American legislation during the depression. The original British disqualification was very broad. It provided that any insured worker who lost employment as the result of a stoppage of work which existed because of a trade dispute was disqualified from benefits during the entire period of the stoppage. See *Hughes, Principles Underlying Labor-Dispute Disqualification* 1 (1946). Later enactments declared certain exceptions, including one which provided that the disqualification shall end where the employee has "become *bona fide* employed elsewhere in the occupation which he usually follows, or has become regularly engaged in some other occupation." *Shadur, "Unemployment Benefits and the 'Labor Dispute' Disqualification,"* 17 *U. Chi. L. Rev.* 294, 315 (1950). The statutes enacted by the states did not precisely follow the British phraseology. Instead, most of them adopted the provision in the Social Security Board draft bill which disqualified the employee for the period of unemployment due to a stoppage of work which existed because of a labor dispute at the premises "at which he is or was last employed." But this quoted language has been widely accepted as having been intended to carry forth the same purposes as those which underlay the British legislation. See *Shadur, supra,* at 315:

"Under the British Acts, the labor-dispute provision is specifically inapplicable if the employee 'has * * * become *bona fide* em-

ployed elsewhere in the occupation which he usually follows, or has become regularly engaged in some other occupation. * * *' The Draft Bills omitted this provision but inserted a reference to labor disputes at the premises 'at which he is or was *last* employed.' Most courts and administrators have pointed to the word 'last' as evidencing legislative intent to approve the 'purge' doctrine. The end result has been a judicial re-enactment of the British exception. Decisions have insisted that the new work be taken as *bona fide* permanent employment with no intent to return to the struck employer after the dispute ends, that the labor dispute be abandoned by the employee upon accepting new employment, and that there be no evidence of collusion with the second employer to attempt to break the causal relation."

See, also, *In re Viert, Vol. 6, No. 8 Benefit Series, Unemp. Comp. Int. Ser.* 82 (*Wash. Super. Ct.* 1943) ; *Schrieber v. ESD,* 8 *CCH Unemp. Ins. Rep.* 50, 162 (*Wash. Super. Ct.* 1955).

In *Bergen Point Iron Works v. Board of Review,* 136 *N. J. L.* 645 (*Sup. Ct.* 1948), reversed 137 *N. J. L.* 685 (*E. & A.* 1948), Bonar was laid off by the Bergen Point Iron Works because of a work stoppage resulting from a labor dispute. He secured employment with the Constable Hook Shipyard and testified that when he took his new job he intended it as permanent employment and did not intend to return ultimately to the iron works. Thereafter he was laid off for lack of work at the shipyard and sought unemployment compensation. The labor dispute was still in progress at the iron works. The former Supreme Court held that his disqualification was not removed by his subsequent employment "even though it be taken for granted that it was intended such employment should be permanent." This holding was reversed by the Court of Errors and Appeals in an opinion which stressed the fact that since Bonar accepted his employment at the shipyard "as permanent in nature and without any intent to return ultimately to the Bergen Point Iron Works" his subsequent unemployment was not due to the labor dispute at the iron works. Although the court did not specifically discuss interim or temporary employment taken with intent to resume employment at the iron works when the labor dispute ended, it may fairly be

inferred from its opinion that it considered such temporary employment to be insufficient to remove the statutory disqualification.

In *Gentile v. Director of Div. of Employment Security,* 329 *Mass.* 500, 109 *N. E. 2d* 140 (1952), the claimants were employees of Reed and Prince Manufacturing Company of Worcester. They and other employees went out on a strike which caused a stoppage of work. Thereafter they obtained temporary employment and when they were laid off they sought unemployment compensation benefits. Their claims were denied under the terms of Massachusetts' labor-dispute disqualification clause which provides that no benefits shall be paid to an individual for any week with respect to which his unemployment is found to be due to a stoppage of work which exists because of a labor dispute at the premises "at which he was last employed." [*G. L.* (*Ter. Ed.*) *c.* 151A, § 25] In denying the claims, the Supreme Judicial Court of Massachusetts said:

"In taking temporary jobs the claimants did not intend to obtain other regular employment. While they held these jobs and after they lost them their regular employment continued to be with Reed and Prince Manufacturing Company. Necessarily when they applied for unemployment benefits this was their last employment. Where the question has arisen it has been generally held that part time or temporary employment does not break the causal relation between stoppage of work due to a labor dispute and the consequent lack of work. See *Mark Hopkins, Inc. v. California Employment Commission,* 24 *Cal. 2d* 744, 151 *P. 2d* 229, 154 *A. L. R.* 1081; *Bergen Point Iron Works v. Board of Review of the Unemployment Compensation Commission,* 137 *N. J. L.* 685, 61 *A. 2d* 267; *Matter of Palmieri,* 276 *App. Div.* 417, 95 *N. Y. S. 2d* 716. In our opinion the board could find that the claimants were last employed at the establishment of Reed and Prince Manufacturing Company and that, as their present unemployment is due to a stoppage of work resulting from a labor dispute at that establishment, they are disqualified from receiving unemployment benefits."

In *Mark Hopkins, Inc., v. California Employment Comm.,* 24 *Cal. 2d* 744, 151 *P. 2d* 229, 231, 154 *A. L. R.* 1081 (1944) striking hotel employees obtained temporary employment and when laid off sought unemployment compensation

benefits. The Supreme Court of California denied their claims under the disqualification clause of the California Unemployment Insurance Act which provides that if the employee left his work because of a trade dispute, benefits shall not be payable for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress "in the establishment in which he was employed." [*West's Ann. Unemployment Insurance Code,* § 1262]. In the course of his opinion for the court Justice Traynor set forth the following principles:

"The termination of a claimant's disqualification by subsequent employment thus depends on whether it breaks the continuity of the claimant's unemployment and the causal connection between his unemployment and the trade dispute. Such employment must be *bona fide* and not a device to circumvent the statute. See 6 *C. C. H. Unemployment Insurance Service* 50,515, *par.* 8111.06 [*Wash. App. Trib. Dec. No.* A-1324, 3/5/42]; 5 *Id.* 38,517, *par.* 8134.15 [*Ohio Bd. of Rev. Dec. Dkt.* 3898, 183-*BR*-42, 3/20/42]; 2 *Id. par.* 1980.02 [*Del. U. CC Dec. Docket No.* 139-*A*, 2/6/42]; 3 *Id.* 17070, *par.* 1980.04 [*Ind. App. Trib.*]; 4 *Id.* 26,049, *par.* 1963.01 [*Minn. App. Trib. Dec. App. No.* 1400, 5/18/40]. It must sever completely the relation between the striking employee and his former employer. The strike itself simply suspends the employer-employee relationship but does not terminate it. *Iron Molders' Union No. 125 of Milwaukee, Wis., v. Allis-Chalmers Co.,* 7 *Cir.,* 166 *F.* 45, 52, 53, 91 *C. C. A.* 631, 20 *L. R. A., N. S.,* 315; *Sandoval v. Industrial Commission,* 110 *Colo.* 108, 130 *P.* 2d 930, 934, 935; see 2 *C. C. H. Unemployment Insurance Service, par.* 1975.053 [*Conn.*] Mere temporary or casual work does not sever this relationship for it does not effectively replace the former employment. The worker expects its termination and does not look forward to that continuity of work and income that characterizes permanent employment. See 3 *C. C. H. Unemplyoment Insurance Service,* 19,047-48, *par.* 1980.06 *Kansas;* 4 *Id.* 33,061, *par.* 1980.06 *N. J. Bd. of Rev. Dec. No.* BR-2056, 2/11/41; 5 *Id.* 35,104, *par.* 1980.06 *N. Y. Ref. Decs.* 544-109-40*R*, 531-244-40*R*, 520-184-40*R*, 9/30/40; 5 *Id.* 38,517, *par.* 8134.15 *Ohio Bd. of Rev. Dec. Dkt.* 3898, 183-*RB*-42, 3/20/42; 5 *Id.* 41,066, *par.* 1980.025 *.Pa. App. No.* B-44-1-*RN*-78, 3/18/41; 2 *Id. par.* 1980.02 *Del. U. C. Com. Dec. Docket No.* 139-*A*, 2/6/42; 6 *Id.,* 50,045, *par.* 1980.061 *Wash. App. Trib. Dec. No.* A-200, 10/15/40; 5 *Id.* 43058, *par.* 1980.01 *S. C. Legal No.* 85, 10/21/38. Similarly, part-time employment of a claimant does not break the causal relation between the trade dispute and his unemployment. See 4 *C. C. H. Unemployment Insurance Service,* 33,061, *par.* 1980.06 *N. Y. Bd. of Rev. Dec. No.* BR-3094, 9/15/41; 5 *Id.* 38,517, *par.* 8134.15

*Ohio Bd. of Rev. Dec. Dkt.* 3898, 183-*BR*-42, 3/20/42; 3 *Id.* 19,047, *par.* 1980.06 *Kansas;* 5 *Id.* 43,058, *par.* 1980.01 *S. C. Legal No.* 85, 10/21/38. Only permanent full-time employment can terminate the disqualification. If *bona fide,* it completely replaces the claimant's former employment, terminating whatever relation existed between the claimant and his former employer."

The claimants take the position that the *Gentile* case was wrongly decided, that the *Mark Hopkins* case turned on language in the California statute which differs from New Jersey's statute, and that the *Bergen Point Iron Works* case did not pass on the precise point which they now raise. They contend that under *N. J. S. A.* 43:21–5(*d*) the labor-dispute disqualification applies only where the unemployment is due to a labor dispute "at the last place" where the claimants worked and that since the last place where the claimants worked was at their interim or temporary employment their subsequent unemployment entitled them to benefits. They urge that the shortness of the temporary employment is immaterial and that the claimants who worked during the Christmas season for only a week or two were no longer disqualified even though the labor dispute at Westinghouse in which they were directly interested continued for months thereafter; indeed, at oral argument they asserted that *bona fide* employment even for a single day (or perhaps a single hour, see *Hughes, supra,* at 58) terminated the statutory disqualification. They view as immaterial the fact that the temporary employment was taken with the intent to return to Westinghouse as soon as the strike was over.

■■ It is urged that a literal application of the definitions in *N. J. S. A.* 43:21–19 would lead to the claimants' interpretation of *N. J. S. A.* 43:21–5(*d*). But such an interpretation would disregard the legislative purposes underlying the disqualification clause. The definitions in *N. J. S. A.* 43:21–19 contain no actual reference to the precise language in *N. J. S. A.* 43:21–5(*d*) and, in any event, they are general in nature and must give way to the specific design of the disqualification clause. The claimants here were striking employees of Westinghouse during the

strike and returned to work at Westinghouse upon termina-
tion of the strike.  They were clearly within the class of
persons which the Legislature intended to disqualify from
benefits.  When they took their temporary employment they
did not alter their status as striking employees of Westing-
house, and when their temporary employment ended they
remained out of work because of the strike.  To pay them
benefits at that time would run counter to the very reasons
for the adoption of the disqualification clause.  And while
the statutory language might have been more expressive it
is adequate to encompass the comprehensive legislative plan.
Thus, it broadly stipulates that benefits shall not be allowable
for any week of unemployment due to a stoppage of work
because of a labor dispute at the premises at which the
claimant is or was last employed.  Under the circumstances
presented in the instant matter it may fairly and realistically
be said that, within the context of the disqualification clause
and without regard to unrelated unemployment situations,
the claimants seeking benefits were unemployed because of a
labor dispute and resulting work stoppage at Westinghouse
where they are or were last employed.  This conclusion
accords fully with the holdings in *Gentile v. Director of
Div. of Employment Security, supra; Mark Hopkins, Inc.,
v. California Employment Comm., supra,* and *Bergen Point
Iron Works v. Board of Review, supra;* and we now approve
and follow the pertinent principles expressed in the opinions
rendered in those cases.

During argument the suggestion was made from the
bench that benefits might be partially allowable to the extent
that they would be chargeable to the temporary employers
and not to Westinghouse.  The suggestion was seemingly
rejected by all of the parties and we have been unable to
find any support for it in the terminology or history of the
legislation or in the authorities.  If the single purpose of the
disqualification were to prevent striking employees from
receiving benefits chargeable to the struck employer's account,
then the suggestion might perhaps carry some weight.  But,
as we have seen, the statutory plan was much broader and

was at least designed to withhold unemployment compensation benefits from striking employees who are not at work because of the stoppage resulting from the labor dispute at their employer's strike-bound plant. See *Tube Reducing Corporation v. Unemployment Compensation Commission, supra; Mortensen v. Board of Review, etc., supra.* We recognize that the Unemployment Compensation Law is remedial in nature and (absent any overriding legislative policy to the contrary) is to be liberally construed in favor of the allowance of benefits. See *Teichler v. Curtiss-Wright Corp.,* 24 *N. J.* 585, 592 (1957). But here there is such overriding legislative policy which binds us as well as the parties and which we must faithfully seek to fulfill so long as it remains in effect. We are satisfied that fulfillment of the legislative policy embodied in *N. J. S. A.* 43:21–5(*d*) requires denial of the claims for unemployment compensation benefits in the instant matter.

The Board of Review contends that under the terms of *N. J. S. A.* 43:21–6(*b*) the appellant Westinghouse is precluded in the Nagy case (claimant Cornelia E. Nagy) from urging the disqualification of *N. J. S. A.* 43:21–5(*d*). The contention is without merit. See *New Jersey Zinc Co. v. Board of Review, etc.,* 25 *N. J.* 235 (1957).

Reversed.

*For reversal*—Chief Justice WEINTRAUB, and Justices HEHER, OLIPHANT, BURLING, JACOBS and FRANCIS—6.

*For affirmance*—None.