CALVIN B. SCOTT ᴇᴛ ᴀʟ., Cʟᴀɪᴍᴀɴᴛs ᴀɴᴅ Rᴇsᴘᴏɴᴅᴇɴᴛs, *v.*
CHADWICK H. SMITH, PAUL McCLURE, ALBERT
ROOT, ᴀs ᴍᴇᴍʙᴇʀs, ᴀɴᴅ ᴛʜᴇ Uɴᴇᴍᴘʟᴏʏᴍᴇɴᴛ Cᴏᴍᴘᴇɴsᴀᴛɪᴏɴ
Cᴏᴍᴍɪssɪᴏɴ ᴏꜰ ᴛʜᴇ Sᴛᴀᴛᴇ ᴏꜰ Mᴏɴᴛᴀɴᴀ, Dᴇꜰᴇɴᴅᴀɴᴛs ᴀɴᴅ Aᴘ-
ᴘᴇʟʟᴀɴᴛs, ᴀɴᴅ Tʜᴇ ANACONDA COMPANY, ᴀ ᴄᴏʀᴘᴏʀᴀᴛɪᴏɴ,
ᴀɴᴅ ᴛᴏ ᴡʜᴏᴍsᴏᴇᴠᴇʀ ᴡᴀs ᴛʜᴇ ᴇᴍᴘʟᴏʏᴇʀ ᴏꜰ ᴛʜᴇ Cʟᴀɪᴍᴀɴᴛ
ᴜᴘᴏɴ ᴡʜɪᴄʜ ᴇᴍᴘʟᴏʏᴍᴇɴᴛ ʜɪs ᴄʟᴀɪᴍ ᴡᴀs ᴍᴀᴅᴇ ꜰᴏʀ ʙᴇɴᴇꜰɪᴛs,
Dᴇꜰᴇɴᴅᴀɴᴛs ɪɴ ᴛʜᴇ Dɪsᴛʀɪᴄᴛ Cᴏᴜʀᴛ.

Nos. 10268-10301, 10392-10394.
Submitted March 30, 1962. Decided December 4, 1962.
Rehearing denied December 21, 1962.
376 P.2d 734

Mr. Justice John C. Harrison dissented in part and concurred in part.

Mr. Justice Adair dissented.

Charles V. Huppe, (argued orally), Helena, Moody Brickett, Butte, R. V. Bottomly, and R. W. Gabriel, Great Falls, for claimants and respondents.

Chadwick H. Smith, (argued orally), Helena, Donald D. MacPherson, and Edward C. Schroeter, Helena, for defendants and appellants.

R. Lewis Brown, Jr., and John Frankovich, Butte, for defendants in District Court.

MR. CHIEF JUSTICE JAMES T. HARRISON delivered the Opinion of the Court.

These cases are consolidated appeals by the Unemployment Compensation Commission of the State of Montana, from judgments made and entered in district courts of the State of Montana, granting unemployment compensation benefits to the respondents. In each case the Unemployment Compenation Commission had denied such benefits and these orders were reversed in the district courts.

It is undisputed that in each case the respondent was a member of the International Union of Mine, Mill and Smelter Workers, belonging to a local in either Great Falls or Butte. Each respondent worked for the Anaconda Company, either in Great Falls or Butte prior to, or on the 18th day of August 1959. On August 19, 1959, the Union called a strike which caused a stoppage of work in Great Falls and Butte, and the labor dispute continued until February 16, 1960.

During the strike each respondent, save one, worked at some other employment for a period of time, and whenever such other employment ceased he filed a claim for unemployment compensation benefits on the basis of such other employment. When the strike ended each respondent was called to return to work on a seniority basis, and each did in fact return to work.

Each respondent was initially found to be eligible for benefits by the Commission but was held to be disqualified by reason of the statute hereafter quoted.

The specifications of error cited by the appellant raise two issues: (1) whether the Anaconda Company was the last employer within the intent of section 87-106(d), R.C.M.1947, and (2) whether the respondent's total unemployment was due to the stoppage of work at the Anaconda Company as defined in section 87-149(a), R.C.M.1947.

Section 87-106(d), R.C.M.1947, before amendment in 1961, provided:

"An individual shall be disqualified for benefits—

       *     *     *     *     *

"(d) For any week with respect to which the commission finds that his total unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed, provided that this subsection shall not apply if it is shown to the satisfaction of the commission that—

"(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

"(2) He does not belong to a grade or class of workers of which immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute;

"Provided, that if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purposes of this subsection, be deemed to be a separate factory, establishment, or other premises; provided, further, that if the commission, upon investigation, shall find that such labor dispute is caused by the failure or refusal of any employer to conform to the provisions of any law of the State of Montana or of the United States pertaining to collective bargaining, hours, wages

or other conditions of work, such labor dispute shall not render the workers ineligible for benefits."

Section 87-149(a), R.C.M.1947, before amendment in 1961, provided:

"Total unemployment: (1) An individual shall be deemed 'totally unemployed' in any week during which he performed no services and with respect to which no wages are payable to him. (2) An individual's week of unemployment shall be deemed to commence only after his registration at an employment office, except as the commission may by regulation otherwise prescribe. (3) As used in this subsection the term 'wages' shall include only that part of remuneration for odd jobs or subsidiary work, or both, which is in excess of seven ($7.00) dollars in any one week, and the term 'services' shall not include that part of odd jobs or subsidiary work, or both, for which remuneration equal to or less than seven ($7.00) dollars per week is payable, or for one (1) day's work not exceeding eight (8) hours, whichever is greater."

The district judges who presided in these various causes heard many cases and since certain facts and exhibits applied to every case, counsel by agreement, and to avoid repetition, did not repeat such matters in each case and stipulated on oral argument that this court may consider all the appeal records as one in reaching its decision.

The Unemployment Compensation Commission on May 1, 1953, unanimously adopted what it called Official Interpretation No. 74 to serve as a guide in the consideration of claims arising by virtue of a work stoppage. It provided for consideration of the following factors:

(a) The intentions of the employee in accepting such subsequent employment;

(b) The length of time for which he is so employed;

(c) The amount of pay as compared with his former wages; and

(d) His intentions with regard to returning to his former

employment when the stoppage of work caused by the labor dispute ends.

On January 8, 1960, and while the work stoppage here involved was in effect, the Unemployment Compensation Commission unanimously adopted its Official Interpretation No. 95, which set up the following factors to serve as guides:

(a) The types of work performed by the claimant at the struck plant;

(b) The rate of pay received by the claimant at the struck plant immediately prior to the labor dispute;

(c) The number of years of seniority accumulated by the claimant at the struck plant, and total length of time employed;

(d) Nature of the work performed for the subsequent employer;

(e) Length of time for which he was subsequently employed;

(f) The rate of pay received in subsequent employment;

(g) Whether or not the claimant has or would be willing to surrender his seniority rights at the struck plant to continue his subsequent employment;

(h) Whether or not there existed an express or implied agreement between the subsequent employer and the claimant regarding the tenure of his employment; and

(i) The claimant's intentions with regard to returning to his former employment when the stoppage of work which caused the labor dispute ends.

There appears to be little difference in effect between the two Interpretations, other than No. 95 is more detailed than No. 74. The Commission, applying these guidelines determined in every case that the claimant's subsequent employment was temporary or stop-gap in nature and did not sever the employer-employee relationship. By reason of such finding each claimant was held to be in the employment of the Anaconda

Company which firm would be the employee's "last employer" within the statute.

Judicial review of decisions of the Unemployment Compensation Commission is provided in section 87-108, R.C.M.1947. Sub-section (d) of such section provides:

"(d)   Court review.   Within ten days after the decision of the commission has become final, any party aggrieved thereby may secure judicial review thereof by commencing an action in the district court of the county in which said party resides against the commission for the review of its decision, in which action any other party to the proceeding before the commission shall be made a defendant. In such action, a petition which need not be verified, but which shall state the grounds upon which a review is sought, shall be served upon a member of the commission or upon such person as the commission may designate and such service shall be deemed completed service on all parties, but there shall be left with the party so served as many copies of the petition as there are defendants and the commission shall forthwith mail one such copy to each such defendant. With its answer, the commission shall certify and file with said court all documents and papers and a transcript of all testimony taken in the matter, together with its findings of fact and decision therein. The commission may also in its discretion, certify to such court questions of law involved in any decision by it. *In any judicial proceeding under this section, the findings of the commission as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of said court shall be confined to questions of law.* Such action, and the questions so certified, shall be heard in a summary manner and shall be given precedence over all other civil cases except cases arising under the workmen's compensation law of this state. An appeal may be taken from the decision of the said district court to the supreme court of Montana in the same manner, but not inconsistent with the provisions of this act, as is provided in civil cases. It shall

not be necessary, in any judicial proceeding under this section, to enter exceptions to the rulings of the commission and no bond shall be required for entering such appeal. Upon the final determination of such judicial proceeding, the commission shall enter an order in accordance with such determination. A petition for judicial review shall not act as a supersedeas or stay unless the commission shall so order." Emphasis supplied.

This provision was interpreted by this court in Jordan v. Craighead, 114 Mont. 337, 342-343, 136 P.2d 526, wherein it was stated:

"Section 6 of Chapter 137, Laws of 1937, provides for the appellate procedure within the Commission which was followed by plaintiff, and permits a judicial review after the applicant has exhausted all those remedies before the Commission. Subdivision (i) provides in part: 'In any judicial proceeding under this section, the findings of the Commission as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of said court shall be confined to questions of law.'

"No fraud is charged and the question before the district court and before this court is whether the findings of the Commission were 'supported by evidence.' Both parties agree that by 'evidence' is meant not a mere scintilla but substantial evidence—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' (Consolidated Edison Co. [of New York] v. National Labor Relations Board, 305 U. S. 197, 59 S.Ct. 206, 217, 83 L.Ed. 126), 'enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' National Labor Relations Board v. Columbia Enameling & Stamping Co., Inc., 306 U. S. 292, 59 S.Ct. 501, 505, 83 L.Ed. 660.

"But that means only that the court must find that the evidence sustaining the findings is substantial and not that in its opinion the evidence *contra* is less substantial or does not pre-

ponderate against it. By the very words of the statute the courts are precluded from considering the preponderance of evidence; for when the evidence is conflicting and is substantial on both sides, the Commission's findings of fact either way are obviously 'supported by evidence' and are therefore conclusive upon the courts. As suggested in the last case cited above, the Commission's findings of fact, like a jury's verdict, need not necessarily be supported by what the court considers a preponderance of the evidence, for that would be to substitute the court's view of the evidence for that of the Commission or of the jury.

"It will be noted further that the Act expressly limits the jurisdiction of the courts to questions of law. Whether there is substantial evidence to sustain the Commission's decision is a question of law, but it is not a question of law whether the Commission decided the question of fact according to the preponderance of the evidence. Thus the sole question for the court with relation to the evidence is one of law, namely, whether the findings are supported by substantial evidence, regardless of whether there is also substantial evidence or even a preponderance of evidence to the contrary."

As in the Jordan case, there is no fraud charged here. While the fact situations on each appeal differ as to the time of subsequent employment, length thereof, and type of work, and so on, yet in each instance they are markedly similar. To give a general view, we quote the findings of fact and conclusion in Cause 10268 involving claimant Calvin B. Scott, as follows:

"The claimant, 27 years of age, is a member of Local No. 16, International Union of Mine, Mill and Smelter Workers, hereinafter referred to as the union. He entered the employment of the above-named employer on June 14, 1958, and performed services thereafter until August 18, 1959. The work he performed was performed under a contract in effect between the union and the employer. When that contract expired on July 1, 1959, and negotiations for a new contract were not successful, the union called a strike against the employer on August

19, 1959, which caused a stoppage of work at the employer's premises. As a result, the claimant became totally unemployed as defined in Section 87-149 of the Montana Unemployment Compensation Law. On August 21, 1959, the claimant secured employment with the Getter Trucking Company, Cut Bank, Montana, and worked until October 15, 1959. On or about November 5, 1959, he returned to work with that employer and worked until November 12, 1959, when he was laid off due to lack of work for him to perform. He testified that when hired he told the employer he was on strike and that he intended to return to work with the Anaconda Company when the strike ended. He also testified that he accepted that employment on a stop-gap basis.

"On October 28, 1959, the claimant filed an initial claim for benefits with the Great Falls employment office effective October 25, 1959. During the period of the strike, he did not resign his employment rights with the Anaconda Company, but kept his time open. The evidence shows that the work stoppage ended February 16, 1960, and that the claimant returned to work with the Anaconda Company on February 27, 1960. [The Commission here quoted Section 87-106(d) of the Montana Unemployment Compensation Law, supra, and then continued.]

"In this case, the claimant was and is a member of the union which called the strike against the employer, the Anaconda Company, and during the stoppage of work, he only accepted and performed temporary work from which he was laid off, when that work was completed. The evidence does not indicate that the claimant ever intended to abandon all rights to return to work with the Anaconda Company, but, rather, that he intended to return to work with the Anaconda Company at the earliest opportunity following the end of the work stoppage. The work he accepted with Getter Trucking Company was not permanent, bona fide employment, but was accepted on a stop-gap basis. Therefore, the Commission finds that the claimant's total unemployment, as defined in the law, at the time he filed

his claim for benefits was due to a stoppage of work which existed because of a labor dispute at the premises of his regular, bona fide, last employer, the Anaconda Company, and he was participating in, financing, and directly interested in the labor dispute, and was and is a member of the union and the grade and class of workers which called the strike. In view of the above, the Commission finds that the claimant was subject to the labor dispute disqualification provision of the law, cited above, during the period of the labor dispute, and that his acceptance of work on a temporary, stop-gap basis did not relieve him of the disqualification, and did not sever the employer-employee relationship between the claimant and the Anaconda Company.

"The Commission does not find from its investigation or from the evidence that said labor dispute was caused by the failure or refusal of the employer, the Anaconda Company, to conform to the provisions of any law of the State of Montana or of the United States pertaining to collective bargaining, hours, wages or other conditions of work.

### "DECISION

"The Appeals Referee's Decision is sustained. The claimant is disqualified to receive benefits from October 25, 1959, until February 16, 1960."

A review of the appeal record clearly shows that the findings of the Commission are supported by evidence within the definition as laid down by this court in the Jordan case.

This brings us to a determination of whether under the facts as found by the Commission as a matter of law claimant Scott was disqualified. While we use this claimant as an example the same principles of law are applicable to every claimant.

At the outset, the Legislature in adopting the Unemployment Compensation Law inserted therein (section 87-102, R.C.M. 1947) a declaration of the public policy in these words:

"As a guide to the interpretation and application of this act, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to

the health, morals, and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this greatest hazard of our economic life. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this state require the enactment of this measure under the police powers of the state for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own."

By reason of this stated policy, the law should be liberally construed in favor of the allowance of benefits, keeping in mind however that such benefits are to be paid only to "persons unemployed through no fault of their own", as specifically charged by the law.

The first question that arises is whether or not one who is on strike is no longer to be considered an employee of the struck employer. The authorities appear to be quite unanimous that the relation of employee and employer is not terminated by reason of the strike.

In Jeffery-DeWitt Insulator Co. v. National Labor Relations Bd., 91 F.2d 134, 112 A.L.R., 948 (4 Cir., 1937), the court stated:

"It has long been recognized by the law, as well as in common understanding, that the relationship existing between employer and employee is not necessarily terminated by a strike. As was well said by Judge Baker, speaking for the Circuit Court of Ap-

peals of the Seventh Circuit, in Michaelson v. United States, 291 F. 940, 942: 'In the case of a controversy over wages and conditions of work in a private and local industry, we agree with counsel for plaintiffs in error that a "strike" does not of itself terminate the relation of employer and employee. A controversy arises, and the employees, then at work, say to their employer: "We shall stop work until you are in what we may consider a more reasonable state of mind. We shall deprive you of our labor as a legitimate means of exerting economic pressure to induce you to yield. If we do go out, we shall remain at hand, ready to negotiate with you concerning fair wages and working rules, and ready to return to work the moment we can agree." If, by reason of a failure to agree, the employees stop their work, a "strike" is on. They are no longer working and receiving wages; but, in the absence of any action other than above indicated looking to a termination of the relationship, they are entitled to rank as "employees," with the adjective "striking" defining their immediate status.'

"In Iron Molders' Union, [etc.] v. Allis-Chalmers Co. (C.C.A. 7th) 166 F. 45, 52, 20 L.R.A. (N.S.), 315, the matter is thus put by Judge Grosscup in his concurring opinion, viz.: 'A strike is cessation of work by employees in an effort to get for the employees more desirable terms. A lock out is a cessation of the furnishing of work to employees in an effort to get for the employer more desirable terms. Neither strike nor lock out completely terminates, when this is its purpose, the relationship between the parties. The employees who remain to take part in the strike or weather the lock out do so that they may be ready to go to work again on terms to which they shall agree—the employer remaining ready to take them back on terms to which he shall agree. Manifestly, then, pending a strike or a lock out, and as to those who have not finally and in good faith abandoned it, a relationship exists between employer and employee that is neither that of the general relation of employer and employee,

nor again that of employer looking among strangers for employees, or employees seeking from strangers employment.'

"And in Tri-City Central Trades Council v. American Steel Foundries (C.C.A.7th) 238 F. 728, 733, Judge Evans thus dealt with the same question: 'Plaintiff's further contention that the defendants were not its employees at the time of the strike, and therefore had no right to picket or persuade by argument those about to enter plaintiff's employment, is not well taken. It is true a striker is not technically an employee. The relation of employer and employee is temporarily suspended during a strike. The situation has been described as: "A relationship between employer and employee that is neither that of a general employer and employee, nor that of employer and employee seeking work from them as strangers." Neither strike nor lockout fully terminates during the strike the relationship between the parties.'

"And the same view was taken by Judge Killits in Dail-Overland Co. v. Willys-Overland, Inc. (D.C.) 263 F. 171, 188, where, in interpreting the word employees as used in section 20 of the Clayton Act, 29 U.S.C.A. § 52, he said: 'As long as conditions are such that what is called a "settlement" might seem reasonably possible between the company and its late workmen, the latter, it seems, should be considered "employees," within the meaning of that term in the Clayton Act. But when the controversy has reached a practical end, there is no reason why the term "employee" should not be held to its ordinary meaning of one who actually works for hire for another and under the latter's control.'

"The same view has been taken by a number of state courts. Thus in Fryns v. Fair Lawn Fur Dressing Co., 114 N.J.Eq. 462, 168 A. 862, 865, the question was whether employees on strike were entitled to the provisions of a contract which had been negotiated under the National Industrial Recovery Act (48 Stat. 195) for the benefit of employees. The court said: 'This enactment, embodied in the contract, gave complainants, while they were employees of defendant and constituted a majority

of such employees engaged in rabbit dressing, the right to organize themselves as members of the Needle Trades Union and the right, if they so chose, to bargain collectively with defendant through the agents of that union. Defendant could not, without breach of its agreement, coerce them into a different organization or compel them to accept as their representative an agent of the Fur Workers' Union. *It is true that complainants went on strike, but, even while on strike, they remained, for the present purpose, employees of defendant.'* (Italics ours.)

"In State v. Personett, 114 Kan. 680, 220 P. 520, 524, in sustaining a conviction under the Kansas Industrial Court Act, the Supreme Court of that state said: 'It may be noted that a strike is not a quitting of employment. The man who goes out on a strike does not profess to quit his employment. He still lays claim to his position and asserts a right to go back and take it at more advantageous terms.'

"In Uden v. Schaefer, 110 Wash. 391, 188 P. 395, 396, 11 A.L.R. 1001, the distinction between a strike and a quitting of work is thus drawn by the court: 'In the common acceptation of the term, it is not a "strike" for the workmen of an employer to quit his employment and go elsewhere, without any intention of returning; nor is it a "strike" for workmen to refuse to enter into the employment of a particular contractor. A "strike," in such common acceptation, is the act of quitting work by a body of workmen for the purpose of coercing their employer to accede to some demand they have made upon him, and which he has refused.'

"See, also, Bayonne Textile Corporation v. American Federation of Silk Workers, 116 N.J.Eq. 146, 172 A. 551, 92 A.L.R. 1450; Densten Hair Co. v. United Leather Workers' International Union, 237 Mass. 199, 129 N.E. 450, 451; Greenfield v. Central Labor Council, 104 Or. 236, 192 P. 783, 207 P. 168."

This same doctrine was approved in 1951 by the Pennsylvania Court in Burger v. Unemployment Compensation Board of Rev., 168 Pa.Super. 89, 77 A.2d 737, wherein it said:

"Where there is a labor dispute, whether it takes the form of a strike or a lock-out, the relation of employer and employee is not severed, but continues until the dispute is settled or until the employe secures other employment. Pennsylvania Labor Relations Act of June 1, 1937, P.L. 1168, § 3(d), 43 P.S. § 211.3(d). See also 31 Am.Jur., Labor, §§ 191, 293. Although work had ceased at the mine, and thereby appellant became unemployed and earned no remuneration, see Law § 4(u), 43 P.S. § 753(u), his status as an employe continued until the end of the lock-out. His status was not interrupted, altered, or destroyed by the labor dispute."

Again in 1952, we find the same holding in Textile Workers Union of America v. Paris Fabric Mills, 22 N.J.Super. 381, 92 A.2d 40, the court there stating:

"The labor contract provided that if an employee quit before June 1, he should receive no vacation pay. The defendant contends that the employees here involved did quit before June 1, because they went on strike against the defendant on April 30, 1951, and continued in strike until after June 1, 1951. The trial judge held that no quitting or abandoning of the employment occurred merely because the employees went on strike against the employer, and that the relation of employer and employee existed on June 1, 1951; and we agree. Jeffery-DeWitt Insulator Co. v. N.L.R.B., 91 F.2d 134, 112 A.L.R. 948 (4 Cir., 1937)."

For other cases to the same effect see the Annotation on Unemployment Benefits, 28 A.L.R.2d 300, § 6.

Since the strike did not terminate the relation of employer-employee we go to the second question, does the taking of other employment, often referred to as stop-gap employment, dissolve the relation?

█ █ While we have never passed upon the specific question as to other or stop-gap employment during a labor dispute, this question has been before the courts of other states. It is the general rule that mere evidence of accepting employment

subsequent to the labor dispute, standing alone, is not sufficient. Further, that the burden of establishing claimant's eligibility for unemployment compensation benefits rests upon him.

The landmark case appears to be Hopkins, Inc. v. California Employment Comm., 24 Cal.2d 744, 151 P.2d 229, 154 A.L.R. 1081 Annot., decided in 1944. There the court stated:

"Section 56(a) of the California Unemployment Insurance Act, under which claimants were originally disqualified, provides that 'An individual is not eligible for benefits for unemployment, and no such benefit shall be payable to him * * * (a) If he left his work because of a trade dispute and for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed.' Stats.1939, ch. 7, § 4, Deering's Gen.Laws, 1939 Supp.Act 8780d, § 56(a). A claimant is thus ineligible for benefits if the trade dispute is the direct cause of his continuing out of work. If a claimant who leaves his work because of a trade dispute subsequently obtains a permanent full-time job, however, he is no longer out of work and the continuity of his unemployment is broken. If he loses his new job for reasons unrelated to the dispute, he is unemployed by reason, not of the trade dispute, but of the loss of the new employment. See 6 C.C.H. Unemployment Insurance Service, 50, 515, par. 8111.06 [Wash.App.Trib. Dec. No. A-1324,3/5/42]; 4 Id. 33,061, par. 1980.06 [N.J.Bd. of Rev. Dec. No. BR-3094, 9/15/41]. The trade dispute that caused him to leave his original employment is not the cause of his subsequent unemployment, and he would no more be disqualified from receiving benefits for such unemployment than if he had not been previously employed in the struck establishment.

"The termination of a claimant's disqualification by subsequent employment thus depends on whether it breaks the continuity of the claimant's unemployment and the causal connection between his unemployment and the trade dispute. Such

employment must be bona fide and not a device to circumvent the statute. [Citing cases.]

"It must sever completely the relation between the striking employee and his former employer. The strike itself simply suspends the employer-employee relationship but does not terminate it. [Citing cases.] Mere temporary or casual work does not sever this relationship for it does not effectively replace the former employment. The worker expects its termination and does not look forward to that continuity of work and income that characterizes permanent employment. [Citing cases.] Similarly, part-time employment of a claimant does not break the causal relation between the trade dispute and his unemployment. [Citing cases.] Only permanent full-time employment can terminate the disqualification. If bona fide, it completely replaces the claimant's former employment, terminating whatever relation existed between the claimant and his former employer. It must be judged prospectively rather that retrospectively, with regard to the character of the employment, how it was obtained, and whether it was in the regular course of the employer's business and the customary occupation of the claimant. [Citing cases.] In the absence of special circumstances, employment of a short duration admits of an inference that it was not entered into in good faith with the intent that it be permanent.

"In each of the cases in the present proceeding the commission held that under the facts the proximate cause of the claimant's unemployment was the loss of work with his most recent employer and not the continuation of the original trade dispute, and that if the claimant was otherwise eligible, he should be allowed benefits. The commission stated that it took account of such factors as the nature of the subsequent intervening employment and the good faith of the claimant and the employer with reference to it, and that the subsequent intervening employment had to be permanent and steady in nature to terminate the disqualification. These tests were proper, but

the record shows that they were not applied by the commission in these cases.

"In six cases [Citing cases.] after claims for benefits were denied by administrative action, the claimants appealed but failed to appear at the hearings on their appeals. There is no evidence in these cases to support the orders of the commission.

"In the cases of Maria Keane McCarthy, Com. Case No. 1302; Natale Lelli, Com. Case No. 1350; and Ethlyn R. Pickell, Com. Case No. 1325, the commission found as a fact that the employment upon which it based the termination of the disqualification was temporary. In the cases of Alois C. Betsch, Com. Case No. 1334, and Margaret Jean Birt, Com. Case No. 1303, the commission found that such employment was part-time, and in the case of Joseph Ferratti, Com. Case No. 1343, that it was temporary and part-time. Employment so characterized by the commission itself is clearly inadequate to sustain an award. These findings are not aided by the commission's statement that such employment was the proximate cause of the subsequent unemployment for this declaration, which appears at the end of the commission's opinion rather than as a part of its findings of fact in all the cases involved in this proceeding, is a conclusion of law from the facts found and not a finding of fact. A legal conclusion clearly based on findings of probative facts requiring a different conclusion is invalidated by such probative facts. [Citing cases.]

"In the remaining cases the commission could not reasonably conclude that the claimants had obtained permanent full-time employment and had completely severed their relations with their former employers. The undisputed evidence shows that the work secured by the claimants during the hotel strike was stop-gap employment, and that the claimants had not forfeited their employment in the struck establishments. Most of the claimants testified that they intended to return to their former jobs at the end of the strike, and they all performed

picket duty during the strike unless excused. The performance of picket duty gives rise to the inference that the employee has a continued interest in his employment at the struck establishment and has not relinquished his job there. Such an inference may be rebutted by evidence that shows clearly that the picketing was not performed because of any interest in retaining employment at the struck establishment and that the claimant has relinquished his position there. Continued membership in the striking union may be necessary to obtain new work in the claimant's customary occupation, and the duty of picketing may be imposed by the union upon all of its members whether on strike, otherwise employed, or employed in nonstruck establishments. Furthermore, one may have no interest in being employed in a struck establishment and yet engage in peaceful picketing to express his sympathy with the cause of those on strike. If, however, a person on strike, who intends to return to his work at the end of the strike, performs picket duty, the conclusion is inescapable that he is a striking employee who is picketing to help make the strike successful so that he may go back to his work with the benefits gained thereby. [Citing cases.]''

In 1948 the matter was before the New Jersey Court in Bergen Point Iron Works v. Board of Review of Unemployment Compensation Commission, 137 N.J.L. 685, 61 A.2d 267. The fact situation as stated in the opinion was:

''Bonar was employed by the prosecutor-respondent, Bergen Point Iron Works, as a watchman. On August 16, 1946, a strike was called at the Bergen Point plant and shortly thereafter Bonar was laid off. He remained unemployed until February 1, 1947, when he secured new employment with the Constable Hook Shipyard. He testified that when he took his new job he intended it as permanent employment and did not intend to return ultimately to the Bergen Point plant. He further testified that he continued at the shipyard as long as he could, but that he was laid off for lack of work on June 19, 1947. He was

250

sick between June 19, 1947, and July 1, 1947, but was available for work thereafter. The strike at the Bergen Point plant was still in progress when Bonar's claim for benefits was heard before the administrative tribunal provided for by the unemployment compensation law.''

The Board of Review found Bonar disqualified from benefits by reason of the labor dispute until February 1, 1947, but further found he took permanent new employment thereafter and was entitled to benefits when he was subsequently laid off. This determination was reversed by the Supreme Court, 136 N.J.L. 645, 57 A.2d 231, which court stated that it did not agree that the '' 'subsequent employment and loss thereof, even though it be taken for granted that it was intended such employment should be permanent, removed the disqualification.' ''

The Court of Errors and Appeals of New Jersey in its opinion continued:

''This places directly before us the proper construction and application of the language embodied in R.S. 43:21-5(d), N.J.S.A., that a claimant shall be disqualified for benefits: '* * * For any week with respect to which it is found that his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed.' * * *

''We are satisfied that a proper construction and application of R.S. 43:21-5(d), N.J.S.A., compels the conclusion that if Bonar accepted his employment at the Constable Hook Shipyard as permanent in nature and without any intent to return ultimately to the Bergen Point Iron Works, his subsequent unemployment was not 'due to' the labor dispute at the Bergen Point Iron Works and he was accordingly not disqualified from benefits from July 1, 1947, when he became available for work. Furthermore, we do not consider it pertinent that work may have been available to him after July 1 at the Bergen Point Iron Works in view of the fact that the strike was then

still in progress. Under the terms of R.S. 43-21-5(c) (2), N.J.S.A., such work at a struck plant is not deemed suitable and benefits may not be denied on account thereof to a claimant who is otherwise eligible. The case of W. T. Grant Co. v. Board of Review, Sup.1943, 129 N.J.L. 402, 29 A.2d 858, cited in the Supreme Court's opinion, where benefits were denied to an employee who voluntarily left her employment in a store, sought factory employment at higher pay, and declined further employment comparable to her original employment, is not applicable.

"The only remaining question is whether Bonar's employment at the Constable Hook Shipyard was, in fact, accepted by him as permanent and without any intent of returning ultimately to the Bergen Point Iron Works. The Board of Review made the express finding that Bonar took such 'permanent new employment' at the Constable Hook Shipyard. Although the Supreme Court's legal determination was on the assumption that this finding was correct, its opinion incorporated the Board's findings with the comment that they are "supported by the evidence" and our examination of the record leads us to a like conclusion. Under these circumstances there will be no occasion for further proceedings in the Supreme Court other than its reinstatement of the determination by the Board of Review awarding unemployment compensation to John P. Bonar.

"The judgment of the Supreme Court is reversed."

In 1952 the matter was before the Massachusetts Appellate Court in Gentile v. Director of Division of Employment Security, 329 Mass. 500, 109 N.E.2d 140, 141. In its opinion the court stated:

"The claimants had been employed by Reed and Prince Manufacturing Company for long periods, their respective terms of employment running 'from several to forty years.' 'They were all members of the union that had called the strike and in some instances, even during the period when they had

had other employment, they did picket duty and kept their eye on the progress of the strike.' 'In all cases the claimants were still interested in the outcome of the strike' and had stated 'that they were going back to Reed and Prince when the strike was settled.' The factual conclusion of the board was: 'It necessarily follows that such intermittent employment that the claimants had from time to time during the strike was merely temporary employment, for in no way did they indicate to the employer or the union that there was any intention on their part to terminate their employment relationship with Reed and Prince. This intermittent work was of a temporary nature and apparently was used as a stopgap until such time as the strike was settled and the employees could return to work with Reed and Prince. * * * Therefore their unemployment is still due to a stoppage of work which exists because of a labor dispute at the establishment of Reed and Prince.

\* \* \* \* \* \*

"* * * In taking temporary jobs the claimants did not intend to obtain other regular employment. While they held these jobs and after they lost them their regular employment continued to be with Reed and Prince Manufacturing Company. Necessarily when they applied for unemployment benefits this was their last employment. Where the question has arisen it has been generally held that part time or temporary employment does not break the causal relation between stoppage of work due to a labor dispute and the consequent lack of work. [Citing cases.] In our opinion the board could find that the claimants were last employed at the establishment of Reed and Prince Manufacturing Company and that, as their present unemployment is due to a stoppage of work resulting from a labor dispute at that establishment, they are disqualified from receiving unemployment benefits."

In 1954 this same proposition was before the courts in New York. In Claims of Lasher, 283 App.Div. 1132, 131 N.Y.S.2d 669, the court stated:

"Appeal by the Industrial Commissioner from that part of the decision of the Unemployment Insurance Appeal Board which related to claimants Oakes and Lickers.

"The two claimants involved in this appeal are structural steel workers who had been working for the Bethlehem Steel Company. On October 3, 1949, they stopped work because of an industrial controversy. A week later, on October 10, 1949, the claimants went to work for another employer in a different community. After six days of work they were laid off and filed claims for unemployment insurance benefits. The Unemployment Insurance Appeal Board has held that the disqualification arising from the industrial controversy terminated when the claimants obtained employment with another employer. The Industrial Commissioner appeals. We think the Appeal Board correctly decided the question. The statute, Unemployment Insurance Law, § 592, subd. 1, Labor Law, Article 18, provides that the accumulation of benefit rights by a claimant 'shall be suspended' during a period 'of seven consecutive weeks beginning with the day after he lost his employment' because of an industrial controversy 'in the establishment in which he was employed.' It also provides, however, that this disqualification does not run after the industrial controversy is terminated. We think that the sense of this is that when an employee who stops work because of an industrial controversy enters the employ of another employer the effect as to him, at least, is a cessation of the industrial controversy. Other disabilities have been regarded as terminated under similar conditions. It has been held, for example, that the penalty for leaving employment without good cause ends when the claimant accepts a new employment Matter of Mittleman (Corsi), 282 App.Div. 587, 125 N.Y.S.2d 840, and the penalty for refusal to accept employment without just cause ends when new employment is accepted. Matter of Weinberg (Corsi), 282 App.Div. 975, 125 N.Y.S.2d 475. The disability here should be treated similarly."

This decision was affirmed without opinion by the New York

Court of Appeals, 308 N.Y. 878, 126 N.E.2d 312. Since the original decision in 1954 and its affirmance in 1955 this case has been cited twice. Once in the majority opinion to the Oluschak Case, 159 A.2d 750, hereafter discussed, and in a dissenting opinion in the same case, reported at 159 A.2d 927.

The majority opinion in Oluschak v. Unemployment Comp. Bd. of Review, 192 Pa.Super. 255, 159 A.2d 750, makes this comment:

"It is true that there seems to be a conflict of authority in New York and Florida with the above decisions but a careful examination of the cases indicate that they turned upon the interpretation of the language of disqualifying statutes dissimilar to ours. Bruley v. Florida Industrial Comm., Fla.App., 101 So.2d 22; In re Lasher, 308 N.Y. 878, 126 N.E.2d 312."

In 1957 the Supreme Court of New Jersey again dealt with the question in Westinghouse Elec. Corp., v. Bd. of Review, 25 N.J. 221, 135 A.2d 489, 495-496, wherein that court said:

"The claimants take the position that the Gentile case [Gentile v. Director of Div. Employment Security, 329 Mass. 500, 109 N.E.2d 140] was wrongly decided, that the Mark Hopkins case [Mark Hopkins, Inc., v. California Employment Commission, 24 Cal.2d 744, 151 P.2d 229, 154 A.L.R. 1081] turned on language in the California statute which differs from New Jersey's statute, and that the Bergen Point Iron Works case [Bergen Point Iron Works v. Board of Review, 136 N.J.L. 645, 57 A.2d 231] did not pass on the precise point which they now raise. They contend that under N.J.S.A. 43:21-5(d) the labor dispute disqualification applies only where the unemployment is due to a labor dispute 'at the last place' where the claimants worked, and that since the last place where the claimants worked was at their interim or temporary employment their subsequent unemployment entitled them to benefits. They urge that the shortness of the temporary employment is immaterial and that the claimants who worked during the Christmas season for only a week or two were no longer disqualified even though

the labor dispute at Westinghouse in which they were directly interested continued for months thereafter; indeed, at oral argument they asserted that bona fide employment even for a single day (or perhaps a single hour, see Hughes, supra, at 58) terminated the statutory disqualification. They view as immaterial the fact that the temporary employment was taken with the intent to return to Westinghouse as soon as the strike was over.

"It is urged that a literal application of the definitions in N.J.S.A. 43:21-19 would lead to the claimants' interpretation of N.J.S.A. 43:21-5(d). But such an interpretation would disregard the legislative purposes underlying the disqualification clause. The definitions in N.J.S.A. 43:21-19 contain no actual reference to the precise language in N.J.S.A. 43:21-5(d) and, in any event, they are general in nature and must give way to the specific design of the disqualification clause. The claimants here were striking employees of Westinghouse during the strike and returned to work at Westinghouse upon termination of the strike. They were clearly within the class of persons which the Legislature intended to disqualify from benefits. When they took their temporary employment they did not alter their status as striking employees of Westinghouse, and when their temporary employment ended they remained out of work because of the strike. To pay them benefits at that time would run counter to the very reasons for the adoption of the disqualification clause. And while the statutory language might have been more expressive it is adequate to encompass the comprehensive legislative plan. Thus, it broadly stipulates that benefits shall not be allowable for any week of unemployment due to a stoppage of work because of a labor dispute at the premises at which the claimant is or was last employed. Under the circumstances presented in the instant matter it may fairly and realistically be said that, within the context of the disqualification clause and without regard to unrelated unemployment situations, the claimants seeking benefits were

unemployed because of a labor dispute and resulting work stoppage at Westinghouse where they are or were last employed. This conclusion accords fully with the holdings in Gentile v. Director of Div. of Employment Security, supra, Mark Hopkins, Inc., v. California Employment Comm, supra, and Bergen Point Iron Works v. Board of Review, supra; and we now approve and follow the pertinent principles expressed in the opinions rendered in those cases.''

Again in 1957 the New Jersey court in New Jersey Zinc Co. v. Board of Review, 25 N.J. 235, 135 A.2d 496, had this to say:

''In August 1955, a strike was called by the union at the mine and mill operated by the New Jersey Zinc Company at Ogdensburg. A stoppage ensued and as a result the claimants were out of work. They were members of the striking union or were in a grade or class of workers which contained some members thereof. While the strike was in effect the Zinc Company continued to pay the premium on its group life insurance policy for all of the strikers, including the claimants. The claimants did not exercise any of the conversion rights which the policy afforded to persons who left the employ of the Zinc Company. They never formally resigned and never gave notice to the Zinc Company that they intended to surrender any rights of seniority, accumulated benefits, etc. During the strike the claimants obtained various jobs which the Zinc Company asserts were interim or temporary in nature and were not permanent jobs taken with intent to sever the employment relation between the claimants and the Zinc Company. The record before us sustains the company's position insofar as the claimants * * * are concerned. It includes their testimony which expressly acknowledges that when they took their various jobs they intended to return to the Zinc Company upon the termination of the strike. When the strike was over they did in fact return to the Company. Their claims (and any other similarly circumstanced) should be rejected under the principles set forth in Westing-

house Electric Company v. Board of Review, 25 N.J. 221, 135 A.2d 489 (1957)."

In 1958 the Alaska court in Alin v. Alaska Employment Sec. Comm'n, 17 Alaska 607, 614-615, stated:

"We now come to a consideration of the question of law raised by claimant. He contends that Chapter 5, Section 74(1) of the First Extraordinary Session Laws of 1955, refers merely to the last place where claimant was employed and not to the last regular employment as contended by the Commission; that therefore he is entitled to unemployment benefits for the period from October 29, 1957 (two weeks after his release by Ellis), to December 24, 1957 (when he became eligible for unemployment benefits by reason of the termination, on December 7, 1957, of the work stoppage caused by the labor dispute). * * *

"Where the Act itself, as here, does not define the meaning of the term 'last employed' it would seem that the Commission could properly construe it to mean in effect 'last *regularly* employed.' To do otherwise would open the door to unlimited abuse. It would permit a striker to obtain any sort of temporary work and when it was terminated to apply for benefits for the loss of the temporary job even though the work stoppage still continued."

Also in 1958 the Florida court had the question before it and in Bruley v. Florida Industrial Commission, Fla.App., 101 So.2d 22, that court stated:

"The facts upon which the matter was determined are simple. Appellant was employed as a bartender, at the Roney Plaza Hotel in Miami Beach, for approximately a year and a half before a strike which began in April of 1955. He quit his job and participated in the strike, and was paid strike benefits for a number of weeks.

"In December of that year he became employed on a regular basis as bartender in another hotel called the Blue Waters Hotel. He continued to work at the Blue Waters Hotel until he was discharged nine months later. It was following his

discharge from that last employment that he made application for the unemployment compensation which was denied him.

"The controlling question, which was before the circuit court and is before this court, is whether the appellant's status of unemployment after he was discharged from the Blue Waters Hotel was due to the labor dispute still in progress at the Roney Plaza Hotel, or simply because he had been discharged from his job at the Blue Waters Hotel. * * *

"Counsel for the commission argues that the appellant's employment by the Blue Waters Hotel for nine months while the labor dispute was in progress at the Roney Plaza Hotel should be considered 'stop-gap' work. Reliance was placed on the case of Mark Hopkins, Inc., v. California Employment Commission, 24 Cal.2d 744, 151 P.2d 229, 154 A.L.R. 1081. That case announces and supports the proposition that when a striker engages in temporary or casual work, his relationship as an employee of the struck concern is not terminated. Comment is made there on the point that a short employment is regarded as interim employment, with an inference that it was not entered into in good faith, and was not entitled to be regarded as permanent to the extent required to terminate the disqualification for unemployment insurance benefits.

"Whether such subsequent employment is to be regarded as 'stop-gap' in the sense in which that term is used by the commission, is one which can vary from case to case, depending on the fact of each case. The length or brevity of the subsequent employment may have a bearing. Basically it is a matter of intent and good faith.

"If the new employment is undertaken in good faith, and with intent on the part of the employee to continue therein on a permanent basis or for an indefinite period, he will have insulated himself against the 'cause' of unemployment which he suffered initially as a result of the labor dispute at the place of prior employment.

"The appellant in this case worked for nine months in new

employment. The record will not support a finding that his employment there was not in good faith, or that it was not regarded by him as being permanent or for an indefinite period. A subsequent willingness or intention to work for the Roney Plaza Hotel, if and when feasible, was given emphasis by the appellee, but we do not regard it as a controlling factor.

"As stated above, this opinion deals with a subsequent employment for a period of nine months at a place at which there was no labor dispute, and which we hold is entitled to be regarded as his last place of employment.

"Accordingly, the order and judgment of the circuit court which is appealed from is reversed, and the cause remanded for the entry of an order by that court not inconsistent with this opinion."

In 1960 the matter was before the Pennsylvania court in Oluschak v. Unemployment Compensation Bd. of Review, 192 Pa. Super. 255, 159 A.2d 750, and we quote from their opinion:

"The claimant was employed by the Westinghouse Electric Company, Lester, Pennsylvania, from sometime in 1941 until October 14, 1955. On that date he became unemployed by reason of a work stoppage resulting from a labor dispute between his union and his employer. The strike ended on August 8, 1956, and he was recalled to work on September 22, 1956, and is presently working for Westinghouse.

"All the facts and circumstances of the labor dispute were presented and passed upon by this Court in Gray Unemployment Compensation Case, 1958, 187 Pa.Super. 425, 144 A.2d 856, in which we held that the work stoppage constituted a strike and that the striking claimants were disqualified for benefits under Section 402(d) of the Unemployment Compensation Law. The record indicates that the claimant, while on strike at Westinghouse, sought and obtained employment at H. W. Butterworth & Sons, Philmont Road, Bethayers, Pa. The employment began on October 23, 1955, and ended by lay-off on March 9, 1956. He did not at any time sever his

employment or resign from the job at Westinghouse nor did. he give to his employer or anyone else any indication of an intention so to do. He testified that the new job paid $1.75 per hour plus bonus, on piece work, and his job at Westinghouse paid, prior to the strike, $2.10½ cents per hour; that it was similar work; that 'I said I would stay if the job was dependable because with the bonus, it would be the same as I was getting and I said if I made out, I would stay there'; and that he joined the union but continued his membership in the Westinghouse union. He remained on the Westinghouse payroll as one of the striking employees, with all the benefits of fifteen years seniority, insurance and other incidents of that employment. After said strike, he was recalled, and with other employees of Westinghouse received the additional benefits won by the strike.

"These facts present for our determination a question of first impression in this Commonwealth, as to whether the intervening employment of a striking employee by another employer, removes the disqualification of Section 402(d) of the Act. Although this issue has not been directly passed upon by the Courts of this Commonwealth it has been decided in other jurisdictions where the disqualifying statute is similar, and their decisions should be helpful guides to us.  *  *  *

"The appellant contends that a worker who voluntarily quits without a necessitous or compelling reason or for wilful misconduct may cure his disqualification by obtaining employment elsewhere, and earning eight times the amount of his weekly benefit rate. He argues that failure to give striking claimants the same treatment discriminates against organized workers. But in those cases the employer-employee relationship was severed, either by the claimant voluntarily quitting his job or by being fired so that he has lost whatever work benefits inured to that employment. The claimant's situation is entirely different in that there is no quitting or no discharge and the work stoppage resulting from a labor dispute is a

261

continuous one for both employer and employee. Here, had he informed Westinghouse that he had quit or by other means severed his employment, a completely different question would be before us. This claimant could have severed his employment and brought himself clearly within subsections (1), (2) and (3) of section 402 (d), supra, by resigning from Westinghouse and the Westinghouse union, so that clearly he would no longer be interested in the outcome of the labor dispute.

"The burden was upon the claimant to prove he was entitled to unemployment compensation benefits. Smith Unemployment Compensation Case, 1950, 167 Pa.Super. 242, 74 A.2d 523. An unemployed person because of a labor dispute, can only recover unemployment compensation when he can prove that he is not directly interested, and that he is not a member of the striking union and that he is not in the same grade or class of workers as the strikers. Curcio Unemployment Compensation Case [Curcio Unemployment Compensation Case, 165 Pa.Super. 385, 68 A.2d 393] supra; Stahlman Unemployment Compensation Case, 1958, 187 Pa.Super. 246, 144 A.2d 670. In this case the claimant must establish, that although at the time of the strike he was disqualified under Section 402(d), he now comes within subsections (1), (2) and (3), by showing he obtained a new job and severed his employment with Westinghouse. The evidence of an intervening job, standing alone, is not sufficient. Such a job could be stop-gap, part time or temporary employment accepted during the strike for economic reasons. The claimant could continue to be 'participating in, or directly interested in, the labor dispute which caused the stoppage of work' and could still be 'a member of an organization which is participating in, or directly interested in, the labor dispute which caused the stoppage of work' and could be in the same grade or class of workers as the strikers. His recall at the end of the strike by Westinghouse is evidence of his continued membership in the union and of the maintenance of his employee status on the Westinghouse pay-

roll, from which it can be inferred that he continued to be 'directly interested' in the outcome of the labor dispute.

"The credibility of witnesses was for the determination of the Unemployment Compensation Board of Review. The board was justified in refusing to accept the claimant's ambiguous statement that 'he would stay if the job was dependable' as evidence of a severance of employment from Westinghouse, especially when by so doing, he was giving up all the work benefits he had piled up with fifteen years of employment at Westinghouse, and the board was justified in concluding that this claimant had failed to sustain his burden of removing the disqualification of section 402 (d) to establish his right to benefits."

The Idaho Supreme Court has also held in Ankrum v. Employment Security Agency (1961), 83 Idaho 271, 361 P.2d 795, that the burden is upon a claimant to establish his eligibility for benefits whenever his claim therefor is questioned.

From these reported cases of other jurisdictions, the following principles appear to be uniformly adhered to:

1.  The burden is upon claimant to show he is not disqualified.

2.  The taking of other employment by a claimant while on strike, standing alone, is not sufficient to establish that burden.

■ 3.  The new employment must not be of the stop-gap, part-time or temporary type, but rather of the permanent full-time type without intention of returning to the struck employer at the termination of the strike.

4.  The new employment must have been undertaken in good faith and be of the type formerly engaged in by the employee or for which he would be skilled and competent.

5.  There must exist a complete and bona fide severance of his employment with the struck employer.

There are three cases from which we have quoted which

claimants contend are authority for payment of benefits to the claimants here.

In the Bergen Point case, supra, 137 N.J.L. 685, 61 A.2d 267, the Board of Review of the Unemployment Compensation Commission found that the employee Bonar had taken "permanent new employment", and the court properly held that "if Bonar accepted his employment at the Constable Hook Shipyard as permanent in nature and without any intent to return ultimately to the Bergen Point Iron Works, his subsequent unemployment was not 'due to' the labor dispute", and he was not disqualified. The court went on to say that the Board of Review made an express finding that the employee took such "permanent new employment," and such finding was "supported by the evidence."

In Claims of Lasher, supra, 283 App.Div. 1132, 131 N.Y.S.2d 669, again the Unemployment Insurance Appeal Board held "that the disqualification arising from the industrial controversy terminated when the claimants obtained employment with another employer." This finding was affirmed by the court without recital in their opinion of the fact situation respecting the subsequent employment.

In the Bruley case, supra, Fla.App., 101 So.2d 22, benefits were denied by the Commission, such holding affirmed by the Circuit Court but reversed by the appellate court. The fact situation disclosed in the opinion shows employment of the same type by another employer steadily over a period of nine months. The court felt it was "unrealistic to say that the appellant's unemployment status for the weeks following his discharge after nine months' employment at the Blue Waters Hotel constituted unemployment due to a labor dispute at a place where he was 'last employed.'" The court went on to say that whether subsequent employment is "stop-gap" would depend on the facts in each case, length or brevity of employment, and basically a matter of intent and good faith. The court from the record before it felt the work was "new

employment," entered in good faith, and regarded by the employee as being permanent or for an indefinite period.

It will readily be seen that none of these cases deviate from the principles we have heretofore outlined, in fact the Bergen Point case and the Bruley case are clearly decided within these principles. It is not possible in the Lasher case to make any determination because of the brevity of the fact statement. The opinion makes no mention of the tenure of the employees with the struck employer but does disclose that their law is dissimilar to ours in that it provides for a period of "suspension" of benefits because of an industrial controvery rather than disqualification. It is likewise worthy of note that none of the previous decisions of appellate courts of other jurisdictions dealing with the specific subject were cited, and the authorities on which the opinion is based, other than their statute, are two New York cases one dealing with penalties for leaving employment without good cause, and the other the refusal to accept employment without just cause.

Turning now to a consideration of the fact situations surrounding each of the claimants, we find that certain claimants performed maintenance work for the Anaconda Company. This work was assigned to them because they were members of the union that called the strike and were employed by the company when the strike began. This was explained by E. G. Cox, Personnel Manager of the Anaconda Company, testifying in Cause 10274, involving George W. Sohl, in these words:

"Q. Are the dates of the claimant's employment correct? A. They're quite close. The seniority date is April 28, 1934, and he worked through August 7, 1959, and started vacation on August 10 through August 30, 1959, and he was called back for maintenance in his proper turn on October 7 to October 11, 1959.

"Q. What was the basis for his being recalled for that maintenance work? A. He retains full seniority and employ-

ment rights and it's on his seniority line up that he's called for maintenance work.

"Q. Is that maintenance work assigned only to the members of the union who were employed within the last, beginning of the strike? A. That's right. It's assigned only to the members of the Mine, Mill Union, yes.

"Q. And those members who were maintaining seniority throughout the labor dispute, is that correct? A. That's correct.

"Q. Do your records show that at any time he resigned his employment rights or seniority with the Anaconda Company? A. He has not resigned any of his re-employment or seniority rights with the Anaconda Company."

This maintenance work was done by claimant during his other employment, as he left such employment to return to the Anaconda Company and after having performed the maintenance work he returned to his other employment.

In 10291, claimant Betsch likewise performed maintenance work while working on the other employment. The same situation appears in 10296—Romanchuk.

In 10270—Archambeau and 10293—Nicola, the claimants performed maintenance work after their other employment had ceased.

In 10272—Andrews, after the referee's hearing but prior to the hearing before the Commission, claimant performed maintenance work.

In 10289—Marn, and 10298—Korst, at the time of the referee's hearing, each had been called for maintenance work and stated they would accept it.

In 10292 — Huntsinger, claimant performed only maintenance work during the strike period.

Employees performing maintenance work during a strike under an arrangement between their union and the employer would clearly be unjustified in asserting any other employ-

ment was anything more than temporary or stop-gap in nature.

Many of the claimants admitted they considered their employment on other jobs during the strike as stop-gap, and that they intended to return to work at the Anaconda Company when the strike ended. We shall not quote such testimony as given by each claimant, but the testimony of Calvin Scott in 10268 is typical:

"Q. At the time you went to work for the Getter Trucking Company, did you tell them you were employed by the Anaconda Company and they were on strike? A. Yes, I did.

"Q. Did you tell them that you were willing to work for them until the strike ended? A. Yes, I did.

"Q. It was your intention to return to work for the Anaconda Company? A. Yes, it is.

"Q. And it is still your intention to return to work there? A. Yes, it is.

"Q. Have you maintained your seniority with the Anaconda Company while they have been on strike? A. As far as I know I have.

"Q. You have not resigned any employment rights with them. A. No. * * *

"Q. Was it your intention to continue working with the Anaconda Company when the strike ended? A. That's right. I have no intentions of not going back to the Anaconda Company. It's the best thing I have paid in to for unemployment. If Anaconda went back to work I was going back to Anaconda. I have proof of that if it's necessary to give proof."

In 10298—Korst, claimant testified:

"Q. When you accepted the job with the Montana Vegetable Oil and Feed Company did you accept that work as stop-gap work so you would have some employment while the strike was on? A. I guess that you would call that stop-gap work.

"Q. Do you intend to return to work with the Anaconda Company when the strike is ended? A. Yes.

"Q. Had the strike ended while you were employed by the Montana Vegetable Oil and Feed Company would you have quit that job and returned to work with the Anaconda Company? A. That was the understanding I had when I hired out there if the smelter went back to work I would quit and go back to work there."

This same situation as to knowledge by the subsequent employer exists in Causes 10286—Larson; 10295—Stoneberg; and 10297—Price.

In 10269—Blomstrom, claimant testified that his employer knew he was on strike. Likewise in 10283—Lunn, claimant, at the referee's hearing, testified:

"Q. What was the nature of your employment when you were hired there? A. Well, there was nothing said, I mean, I informed him that I was on strike and there was nothing said about being temporary or anything.

"Q. When you informed him that you were on strike, did you mean that you wanted him to know that you were on strike and if the smelter strike was settled, that you would go back and work there? A. I'd go back to work if I didn't find anything more suitable.

"Q. When you went to work for Mel Buck, did you resign your employment with the Anaconda Company? A. No.

"Q. Have you done that at anytime since? A. No.

"Q. You have not abandoned your employment there? A. No.

"Q. You wish to retain all re-employment rights that you have there? A. Providing that I don't find anything more suitable or as suitable in the meantime.

"Q. Have you found anything as of today? A. As of today? No."

In 10273—Johnston, claimant stated he was going to return to work for the Company when the strike ended. The same situation exists in 10274—Sohl; 10275—Bierwagen; 10279—Nelson; 10280—Burback; 10284—Ankney; 10285 — Reiss;

10286—Larson; 10287—Juneau; 10289—Marn; 10290—Lords; 10292—Huntsinger; 10293—Nicola; 10297 — Price; 10298 — Korst; 10299 — Vezina; 10300 — Rooney; 10392 — Richards; 10393—Sandoval and 10296—Romanchuk, in which claimant testified:

"Q. Is it your intention to return to work with the Anaconda Company when the strike is settled? A. Yes.

"Q. What you say at the present? A. Yes, it's a year round job and with the seniority I have now it would be quite foolish to give up thirteen years rights on my job."

Some of the claimants admitted the work they did during the strike was of a temporary, stop-gap or seasonal nature. Such admissions appear in the record in Causes 10394—Richards; 10393—Sandoval; 10392—Walters; 10268—Scott; 10275 —Bierwagen; 10295—Stoneberg; 10299—Vezina; 10284—Ankney.

Likewise in 10288—Peterson, claimant worked on a construction job and he testified:

"Q. At the time you were hired by the Holland Construction Company, how long were you hired to work? A. Well, that I don't know. They was working there and they just started the job and I assumed I would work there as long as the weather permitted or the job lasted.

"Q. While you were employed by the Holland Construction Company where was your family? A. I had them boarding out in Great Falls, here, in private homes. Paying room and board on them.

"Q. When you were here in Great Falls they lived with you and you have a home established? A. Well, yes, they live with me here.

"Q. How much did Holland Construction pay you? A. They paid $3.25 an hour on the scraper and on labor, $2.42 and operating the crusher, it was $3.10.

"Q. When you took the job with Holland Construction what was your intention, to stay on that job? A. Well, to

stay on it or, there wasn't any other work to be gotten, as long as they'd have me.

"Q. What caused you to leave that job on December 22nd? A. They finished the job there.

"Q. What type of job was it, road construction? A. Yes.

\* \* \*

"Q. You knew it was a construction job? A. Yes.

"Q. You worked at construction jobs previously? A. Yes.

"Q. Is it the practice in the construction jobs that employees get paid year round? A. No, it's seasonal.

"Q. It depends on such things as getting jobs and weather and that sort of thing. A. Yes.

"Q. You knew when you took the job with Holland Construction that it was for that particular job? A. Yes."

In 10272—Andrews, claimant went to work on a farm at Power, Montana. He there received $1.50 an hour as compared with wages of $18.30 per day with the Anaconda Company. That this farm work was of a temporary nature is quite clear in view of claimant's testimony:

"Q. When you took this job with Wm. LeFebure, what was your understanding with Mr. LeFebure relative to your employment there? A. My understanding was that I was to work there until all his work was finished. The construction work was done.

"Q. If the strike had been settled while you were employed there, would you have quit that job to return to work with the Anaconda Company? A. No. That wasn't my agreement. My agreement was to stay there until the job was finished.

"Q. On November 13th when you filed your claim for unemployment benefits you stated that you planned on returning to work for the Anaconda Company when the strike ended and the only reason you took the job with LeFebure was to defray living expenses while you were on strike. A. No, that isn't what I stated.

"Q. How do you account for the facts on record then? A. That isn't the way I wrote it. I told them that I would probably return, but not for sure because if I had got a better offer I would have stayed there.

"Q. You probably would return to work with the Anaconda Company you mean? A. If I did not have a job, I probably would return to work with the Anaconda Company."

Since the wage differential between the farm employment and that with the Company was so great it is obvious he would have returned to his former job when it became available.

In 10282—Mangold, claimant was not present at the referee's hearing but was represented by counsel. Claimant had worked for Consolidated Freightways, and the general manager of that company testified:

"Q. Was the claimant in this case, Leon W. Mangold, employed by Consolidated Freightways for some period of time? A. Yes, he was employed by us on October 21, 1957.

"Q. During this period of time, from October 21, 1957 until August 18, 1959, what was the basis of his employment? A. He was a part-time casual employee who would be called to work on a part-time basis as an extra employee when we had work to be done, for him to do.

"Q. Was the man just working on his days off or whenever he could work in his shift with the shift you wanted him for? A. Yes, the time he could work for us was governed by his further activities. If he was not on shift at the other job.

"Q. That was on a part-time basis? A. Yes, part-time basis. Part-time employee.

"Q. You considered him as such? A. Yes, he is carried as such on our records, considered as such in our organization."

As to claimant's employment during the strike period the general manager stated:

"Q. After the commencement of the strike, did he work more than he had been working before the strike? A. Yes, he worked considerably more after the strike than he had been

before because he was available more and being on strike he needed other employment and it was at that particular time of the year is our busy season.

"Q. Was it ever your intention to hire him on a permanent full-time basis? A. We had not intended to hire him on a full-time basis. His employment with us was strictly on a part-time situation.

"Q. Did it continue on that same basis after the strike commenced? A. Yes."

It was contended by some claimants that by reason of the fact the Company was not going to reopen the Emma and Anselmo Mines that they had no jobs to return to. In this connection, James Carden, representative of the Anaconda Company testifying in 10300—Rooney, was asked:

"Q. Is it not true that when the strike is over the company has made statements that there will be two mines that will not reopen? A. They have made those statements.

"Q. That every man will actually be on his own as far as getting a job is concerned? A. That part I don't know."

In 10301, Aklin, claimant's exhibit 2 is a letter dated December 21, 1959, addressed to members of the Butte Miners Union and signed by Ed Renouard, an official of the Anaconda Company, which contained these statements:

"1. Men employed at the start of the strike could return to work without physical examinations.

"2. Upon return to work, the Company would recognize authorization cards signed with the Montana Physicians Service for hospital insurance for employees and their dependents and would pay its share, averaging $10.30 per man per month which was the amount previously contributed.

"3. Earned vacations would be scheduled immediately after the return to work. Men not returning to work but qualified for vacations would receive their vacation pay.

"4. The strike does not constitute a break in service for

purposes of the pension plan. Payments to pensioners and granting of pensions are not affected by the strike.

"5. Employees who were working when the strike started could rustle jobs at any of the reopened mines the same way as in the past. No rustling cards would be necessary for these men. Men who had been working at the Emma and Anselmo could rustle at any operating mine.

"6. The committee was informed that if the men returned to work before Christmas the following operations would re-open: Mountain Con, Steward, Kelley, Elm Orlu-Black Rock low grade project, Berkeley and Alice pits."

It is to be noted from the Company letter that men employed in the Emma and Anselmo mines were to be permitted to "rustle" for a job at any other operating mine, and the other statements contained in the letter do not indicate that any particular employee has lost his job. While there is some indefinite testimony with regard to purported news releases or other communications issued by the Company none appear in any of the records before us.

The situation here is analogous to that in State ex rel. Employment Security Commission v. Jarrell, 231 N.C. 381, 57 S.E.2d 403, wherein the court said:

"On June 30, 1947, the Company undertook to reopen the plant. It persisted in this effort for a week, and then gave over because a sufficient operating force would not cross the picket lines. On July 7, 1947, the Company posted this notice on its bulletin board: 'Notice to all employees. Pee Dee Mill No. 2 will cease all operations effective as of this date for an indefinite period. All employees are free to seek employment elsewhere.' The Company utilized some time next succeeding the posting of the notice in renovating the machinery in the mill. On September 1, 1947, Golding sold his capital stock in the Company to Carella and Guorgopoulous, and on October 1, 1947, Clairmont made a similar transfer to the same parties.

On the day last mentioned, Pee Dee Mill No. 2 resumed normal operations.''

The Employment Security Commission found:

'' '5. That thereafter the plant remained closed until October 1, 1947, at which time it reopened and resumed operations for all intents and purposes.'

''On the basis of its findings of fact, the Commission concluded as a matter of law that the notice of July 7, 1947, totally separated the employees at Pee Dee Mill No. 2 from their employment by the Company and 'that the unemployment of employees of the plant subsequent to that date was not caused by a stoppage of work attributable to a labor dispute, but was caused by the total separation of such employees from employment by the employer.' The Commission thereupon adjudged that the 55 claimants 'are entitled to benefits without disqualification, if otherwise eligible, on and after July 31, August 5, August 7, and September 1, 1947, according to the date of claims filed.' ''

The Supreme Court in reversing the Commission stated:

''Each of the claimants was required to show to the satisfaction of the commission that he was not disqualified for benefits under the Employment Security Law by this statute. In re Steelman, supra. This being so, the decision of the Commission constituted an adjudication that the 55 claimants were not disqualified for benefits under G.S. § 96-14(d). As the claimants did not base their claims on the proviso in the statute, this adjudication was necessarily bottomed upon the conclusion of law that the unemployment of the claimants during the periods covered by their claims was not due to a stoppage of work which existed because of a labor dispute at Pee Dee Mill No. 2. This brings us to the final question as to whether this conclusion of law is sustained by the only finding of fact invoked for that purpose, i. e., the finding that on July 7, 1947, the Company posted this notice on its bulletin board: Notice to all employees. Pee Dee Mill No. 2 will cease all

operations effective as of this date for an indefinite period. All employees are free to seek employment elsewhere.'

"The Commission advances a line of reasoning to establish the connection between this finding of fact and the conclusion of law necessarily underlying the decision of the commission and the judgment of the Superior Court affirming it. It concedes that all unemployment of workers at Pee Dee Mill No. 2 between June 2, 1947, and the moment of the posting of the notice of July 7, 1947, was occasioned solely by a strike arising out of the inability of the Company and the Union representing a majority of its employees to agree on a contract covering work in the mill. It asserts, however, that the notice of July 7, 1947, constituted in law a discharge by the Company of all of its employees, and that by reason thereof any subsequent unemployment of the claimants was occasioned by their discharge and not by a stoppage of work which existed because of a labor dispute at Pee Dee Mill No. 2. The Commission insists that this conclusion is valid regardless of what event may have occurred at the plant subsequent to the posting of the notice, and regardless of what parts the claimants may have played in such events.

"This reasoning ignores both the plain wording of the notice, and the realities of the situation as depicted by the other findings of the Commission. When the notice was posted, Pee Dee Mill No. 2 was completely closed by a strike which had been in progress for more than a month. Efforts to resume operations had proved futile. There was no prospect that the plant could be reopened by the Company at any time within the foreseeable future. By posting the notice, the Company merely accepted the shut-down of the mill as an accomplished fact, and signified its willingness to terminate its employment relationship with any worker who elected to withdraw from the existing labor dispute and to seek work elsewhere. The notice did not alter the status of any employee who refrained from exercising this option. It certainly did not cause the unemploy-

ment of those who were already on strike and who continued on strike until the existing labor dispute ended.

"None of the findings of fact indicate that any of the claimants elected to withdraw from the labor dispute and to seek work elsewhere.

"It follows that the facts found by the Employment Security Commission do not support the conclusion of law and the resultant decision of the Commission, or the judgment of the Superior Court affirming such decision. The judgment of the Superior Court is, therefore, Reversed."

In 10301—Aklin, claimant worked in Yellowstone Park on construction work as a laborer. While he stated the work was to be steady it also appears that he was reluctant to resign his employment with the Anaconda Company. As he stated:

"Q. If you are able to get permanent work someplace would you forego your rights with the Anaconda Company to stay on that job? A. I've been with the A. C. M. a long time. I've been working there steady. I have a wife and 2 boys to support; you take work where you can.

"Q. You worked for Studer until October 23rd. What caused you to leave your job at that time? A. My ankle was swelled up. * * *

"Q. Does that bother you when you were working? A. It was. I'll explain it to you, Mr. Chilton, Mr. Davis. While cutting logs, you know these trees, well, you piled them in piles and then we'd have to go in there and bust them up. The snow and rain, you know, all the time, they slip and slide. You know how that is. They cut the trees and they busted them up. It was climbing over one tree and then another and it finally got my foot down and it started to swell up on me. After I told, well, I said my foot, well my hand was all swelled up on me too. That was from the vibration of the saw though and I told the foreman, I said, 'I've got to take a few days off' and the fellow says, 'There's no need in you coming back. The job's only going to last a few days and the job's only

going to last a few days longer and there's no use in you coming back.' ''

The wage on construction was $2.04 per hour compared to about $18.00 base pay at the Anaconda job. Claimant was asked:

''Q. Would you have foregone your pension rights and seniority rights with the Anaconda Company if they still had work for you there? A. Well, that would be a hard thing to do, to say, Mr. Chilton, because that's all I know practically is mining. I worked in this line practically half of my life.''

In 10276—Korst, claimant went to work for the Meadow Lark Country Club during the strike and was laid off for lack of work. He applied for benefits and such benefits were paid for a period of weeks until on January 11, 1960, he was found to be disqualified under section 87-106(d). Claimant appealed and requested a hearing upon these grounds.

''I feel that the determination is unjust and unfair. I was declared eligible and received eight checks. Now I receive an amended determination making me ineligible. Why?''

The Appeals Tribunal set the matter for hearing on March 2, 1960. The claimant did not appear at the hearing. The Anaconda representative testified with regard to claimant's employment by the Company from March 31, 1951, through August 18, 1959; that the claimant was called back to work after the strike was settled and returned to work on February 24, 1960. The referee found claimant disqualified for benefits and claimant appealed to the Commission which affirmed the decision of the referee, and the appeal to the district court followed.

In 10277—Davies, claimant, following his disqualification appealed and stated:

''I was employed by Birch Const. and was laid off due to lack of work. I have worked for Birch Const. more than three weeks and as long as the employer is paying into the unemployment fund, I feel that I should not be found ineligible. Due

to the fact that I was eligible after finishing work at Birch Const. Co. I fail to see why I should be ineligible now."

Claimant did not appear at the referee's hearing but was represented by counsel.

In 10278—Wheeler, claimant appealed from denial of benefits on the ground:

"I feel that I should be eligible for benefits on the grounds that I have had other employment and I know of other members of the Mine Mill union that have been deemed eligible under the same conditions. I am fully available and seeking work."

The hearing was set before a referee, but claimant did not appear and the hearing was reset but again no appearance was made by him. Claimant had worked for 21 days in October and November 1959. He returned to work for Anaconda on February 23, 1960, when he was recalled.

Claimant appealed from the referee's decision to the Commission, but at the time set for such hearing did not appear, however he was represented by counsel who stipulated the case should be submitted on the records of the Commission.

In 10269—Blomstrom, claimant worked on two farms, both admitted to be temporary and then went to work for a contractor at Glasgow. He was laid off after working approximately one month. He stated at the hearing that he would go back to the Anaconda Company if the strike was settled before he was recalled by the contractor in the spring.

In 10271—Luoma, claimant worked on maintenance work in October and then secured a job with a construction company for about two months. He stated that he was not willing to surrender his seniority rights at the Anaconda Company. He did not appear at the referee's hearing, nor at the Commission hearing but there he was represented by counsel.

In 10294—Linn, when claimant filed his claim he stated his reason for leaving the job was because it was a temporary one. On his appeal and request for hearing he stated he did not plan on returning to Anaconda and that he was looking for a

full-time job. Claimant is a young man of 19 years, single, and only worked for the Anaconda Company for four months before the strike. His new employment consisted of operating an extra truck for a delivery service, and he was laid off at Christmas time for lack of work. He did not appear at the hearing but was represented by counsel.

The records of the Commission in these cases contain nothing which would sustain the burden of claimant to prove his eligibility for benefits. It is true that in some instances benefits were paid to claimants who were later found to be disqualified. These cases were caused by the natural confusion resulting from the multitude of claims submitted as the result of this labor dispute. The Commission rectified the situation as rapidly as it could, and the fact that certain claimants were erroneously paid benefits does not establish a precedent for payment of benefits to other disqualified claimants.

Counsel for claimants complain that the questions asked by the appeals referee were leading, suggestive, and exhibited a design seeking to disqualify the claimants. Claimants in most instances were not represented by counsel at the time of the referee's hearing. It is true that the referee asked claimants about their intentions with respect to returning to work for the Company when the strike was settled, and most claimants frankly admitted such was their intention. It was incumbent upon claimants to prove they were not disqualified, as we have heretofore set forth, and we find no display of bias on the part of the referee, or improper questioning. In fact, in each case, he asked claimant, if the claimant was present at the appeal hearing, if he felt that he had a fair opportunity to present his case, and in each instance the claimant replied that he had.

When claimants were represented by counsel the referee addressed counsel in words much as he did in cause 10294—Linn, being: ''As the representative of the claimant at this

hearing, Mr. Brickett, do you feel that you've had a fair opportunity to present your case here today?"

Mr. Brickett responded: "Yes, I do. I feel that it was a fair hearing."

It must be remembered that someone must bring out the facts at a hearing, and if a claimant does not have counsel to produce the fact situation by questioning the witnesses that duty of necessity falls upon the referee.

In 10281—Schlecht, claimant was employed by the Pierce Packing Co. at Billings from August 31 to December 10, 1959, when he was laid off for lack of work.

At the packing plant he received $1.89 per hour to start and was raised to $2.05 per hour. He testified he was hired as a steady man though the work he started on was seasonal and it declined in volume. He owned his own home in Great Falls but moved his family to Billings, rented an apartment there and rented out his home in Great Falls. His wage at Anaconda had been $2.20 per hour. He had previously worked at the packing plant before coming to Great Falls. In Billings he joined the butcher's union.

His attitude is disclosed by this testimony at the referee's hearing:

"Q. Mr. Chilton asked you a hypothetical question. I'd like to ask you a hypothetical question. If the Pierce Packing Company in Billings had kept you on as steady work and you had gotten this increase of $2.37, would you be likely to know at this time what you would have done at that time? A. Well, no, I don't really know. I liked working out there at the ACM and get more pay over there. I got a lot of overtime when I worked there.

"Q. Your family was over there too, your mother and father? A. Yes.

"Q. Were you at any time, Mr. Schlecht, ever asked to resign your seniority rights or your employment status with

the Anaconda Company by anybody? Were you ever asked to resign? A. No.

"Q. Give up any rights that you may have acquired? A. No.

"Q. Did you tell the Pierce Packing Company in Billings that you had been working at the Anaconda Company and that the men went out on strike? A. Yes.

"Q. They fully understood that? A. Yes.

"Q. Did he ask you whether or not that if and when the strike was over you would quit, or what? A. Well, I told them that I * * *

"Q. Did you tell your employer at any time that you would stay with him if you got a steady job, or anything to that effect? A. Well * * *.

"Q. Well, let me put it this way. Did you understand it to be a steady job? A. Yes, I understood it would be steady. * * *

"Q. Did anybody representing Pierce Packing Company ever ask you what you were going to do when the strike ended? A. Yes, my boss asked me if I was going to leave that job.

"Q. What did you say to him? A. I told him that if I thought the job here was better or was more pay, I would consider it. I told him I'd worked there before for Pierce Packing and I liked it a lot better then, than I thought I would now, so I thought I might change. * * *

"Q. Were you in a position, while you were working for the Pierce Packing Company in Billings, to make up your mind, one way or the other whether you were going to go back to the Anaconda Company? Did you form an intent at that time as to what you were going to do? A. No, not at that time.

"Q. You didn't? A. No.

"Q. And don't you think you'd be a little bit silly to resign your rights? A. Yes, it would have.

"Q. Until you had something you were sure of, positively sure of, at least? A. I guess so.

"Q. In the same line, Mr. Schlecht, is it true then, that according to your testimony that you didn't want to burn any bridges behind you, that you still wanted to still keep your job here with the Anaconda open in case something happened in Billings, that you could always return here if you wanted to at the end of the strike? Is that right? A. Well, I took that job there. I was out of, had no other work at the time, and I had to. If I'd got a better job I might have stayed over there. I had no intent of that. I'd keep hold of my rights here until I could get back in again.

"Q. So that you kept those rights so when the strike ended and your name came up on the seniority list you were called back to work and you did report back to work? A. Yes.

"Q. In accordance with their call? And you did report back to work? A. Yes."

Again at the hearing before the Commission he was asked with reference to his intentions:

"Q. So you didn't care to resign at the time because you didn't feel any necessity to do so, is that right? A. I didn't have to make a choice if I had to resign.

"Q. In other words, you didn't want to leave yourself in a position where you quit a job and couldn't get back on again possibly after the strike was over, isn't that right? If you wanted to go back? A. Well, yes.

"Q. I'll state it more plainly. In other words, you didn't during the course of the strike, to bar yourself from being able to go back to the Company after the strike was over if you wanted to, isn't that right? A. Yes."

The reluctance of the claimant as evidenced by these answers indicates that he did not consider his new employment as permanent, but rather he wanted to be able to return to the Anaconda Company when the strike ended if he desired. That was his privilege, but in such a situation he is disqualified from benefits.

Having reviewed the records before us of the various claim-

ants it appears that in no case did the claimant sustain his burden of proving he was not disqualified; and in no case did a claimant show a complete and bona fide severance of his employment with the struck employer.

Further, no claimant proved that he had no intention of not returning to work for the struck employer at the termination of the strike.

For these reasons the district court was in error in reversing the orders of the Commission and granting benefits.

The judgments are reversed with instructions to enter judgment in each cause affirming orders of the Unemployment Compensation Commission.

MR. JUSTICES CASTLES and DOYLE concur.

MR. JUSTICE JOHN C. HARRISON:

Dissenting in part and concurring in part.

While I am able to agree with parts of the majority opinion, yet I feel compelled to dissent to other parts thereof as I shall hereafter point out.

Our Legislature in passing the Unemployment Compensation Act in 1937 declared in section 87-102 the public policy which is as follows:

"As a guide to the interpretation and application of this act, the public policy of this state is declared to be as follows:

"As a guide to the interpretation and application of this act, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this greatest hazard of our

economic life. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, *declares* that in its considered judgment the public good, and the general welfare of the citizens of this state require the enactment of this measure under the police powers of the state for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.'' Emphasis supplied.

From a reading of this section, it is clear that the Legislature set forth several general policies in its declaration to be considered in such cases as this.

(1) ''Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of the state.''

(2) ''*Involuntary* unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family.''

(3) ''The achievement of social security requires protection against this greatest hazard of our economic life.''

(4) ''This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of *poor relief* assistance.'' and

(5) ''The legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this state require the enactment of this measure under the police powers of the state for the compulsory

setting aside of unemployment reserves to be used for the benefit of persons unemployed through *no fault of their own.*" Emphasis supplied.

Reading this section and the sections that follow, particularly section 87-106 which sets forth the qualifications for benefits, it is clear that the Legislature did not intend that workers unemployed due to a labor dispute would be compensated for, under, and through the unemployment compensation law. In the one case that has been before this court, Jordan v. Craighead, 114 Mont. 337, 136 P.2d 526, this court so held.

Insofar as the majority opinion goes in holding that the above section does not allow compensation to persons engaged in labor disputes, I concur due to the fact that it is the stated statutory law and interpreted case law of the state. However, I find myself in disagreement with the majority opinion on its findings in numerous of the cases included herein and will set forth general reasons for my dissent on principles that I believe the majority opinion failed to consider or to give sufficient thought to.

It appears to me that the majority opinion has laid too much stress on the failure of the employee to give notice to his employer of the termination of his employment before he found employment elsewhere. It would appear to me from the majority decision that it would be necessary for an employee out on strike who finds work elsewhere to give written notice to his employer of the fact that he had found work elsewhere and would not return to an employment of the struck employer after termination of the strike. This I do not understand as a requirement of the law. Throughout these cases there is evidence to prove the fact that employees in good faith and by diligence had found employment elsewhere in some instances had gone as far as 300 miles from their place of last employment, for periods of two and three months and in several instances the families had moved from the location of the struck plant to a new location where the employee found employ-

ment. All of which shows that the employee desired to secure steady work and maintain his family during the period in which his family might otherwise incur debts due to the strike of his last place of employment. It is a stated policy that the Legislature adopted the Unemployment Compensation Act to encourage employment, to maintain the purchasing power, and to remedy the serious consequences of poor relief in communities of the state. The acts of the employee in some instances show good faith in their efforts to secure permanent employment.

While the majority opinion cites Hopkins, Inc., v. California Employment Commission, 24 Cal.2d 744, 151 P.2d 229, 154 A.L.R. 1081; Bruley v. Florida Industrial Comm., Fla.App., 101 So.2d 22, (1958), I do not think they gave sufficient consideration to their holdings. These cases hold that the determination of a claimant's qualification by subsequent employment depends on whether it in fact breaks the continuity of the claimant's unemployment and the casual connection between his unemployment must be bona fide and not a device to circumvent the statute; and that it must be permanent, full-time, completely replace the former employment and terminate the relationship between the claimant and his former employer; however, these cases do not require formal notice to the employer of such termination. To require more of the employee is unfair and contrary to the true spirit of the law. It penalizes a person who honestly tries to support himself and his family, during a period of unemployment due to a labor dispute, simply because he neglects to notify his employer of his new employment. This law was intended to encourage employment, not discourage it, and during periods of economic stress caused by labor disputes the participants who must rely upon daily wages should be encouraged rather than discouraged in seeking other employment.

As has been pointed out by the majority opinion, the Unemployment Compensation Commission in May 1953, adopted

what is called Official Interpretation No. 74, to serve as a guide in the consideration of the claims arising out of, and by virtue of a work stoppage. This memorandum is set forth in detail in the majority opinion. Subsection (i) of said memorandum lists, "(i) *The claimant's intentions with regard to returning to his former employment when the stoppage of work which caused the labor dispute end[ed]."* This subsection, as evidence in making a determination, raises some question when viewed in retrospect. While there can be no question that the Unemployment Compensation Commission could set forth their examiner guidelines in these types of cases, it should be pointed out that here the strike commenced on August 19, 1959, and ended on February 16, 1960. I believe every case before the court was heard by the appeals referee after February 16, 1960, and when the question was asked by the referee, as to what the intentions of the employee were under subsection (i), it would appear to me that it was grossly unfair.

There could be but one answer to the question at this time of claimant's work career, that is, "Yes, he intended to return to the Anaconda plant at the termination of the strike. He has been unemployed by a labor dispute for a period of some six months. During this period he has by diligence secured another job which might well have been a permanent job had there not been some intervening circumstances over which he had no control that took him off that job." The strike has ended, he has either gone back to work or is about to go back, and if he answers the question any differently he will place himself in a position where the employer could punish the employee who had been on strike. This, I do not feel, the Legislature intended to allow.

Having made no specific findings on the bona fides of the claimant's efforts to secure new employment, and the fact that the decision of the Board, as affirmed by the majority of this court, is based upon what I think is a misunderstanding

of the law relating to the matter of severance of the employment, I would sustain the decision of the district court in those cases where there has been a clear showing that the employment was of a permanent nature, and the employee for all intents and purposes established new employment and said new employment was not for the purpose of contravening the Unemployment Act.

In those cases where new employment met the standards set forth in the Hopkins and Bruley cases, I would say the employee's last place of employment was not the Anaconda Company, but that employer who had the employee on the payroll over a period that would indicate permanent employment and would therefore be the last employer.

MR. JUSTICE ADAIR:

I dissent.

I am of the opinion that the judgments made in these consolidated appeals by the three District Judges who heard and decided the above consolidated appeals, namely, the Honorable W. W. Lessley, the Honorable Jack R. Loucks, and the Honorable Paul G. Hatfield, are correct and that each of such judgments should be affirmed. Accordingly, I respectfully dissent to the majority opinion of this, the Appellate Court, in its entirety.